1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Roger Wayne Murray,                )    No. CV-03-775-PHX-DGC
                                        )
10                 Petitioner,          )    DEATH PENALTY CASE
                                        )
11  vs.                                 )
                                        )    **MEMORANDUM OF DECISION**
12  Dora B. Schriro, et al.,            )    **AND ORDER**
                                        )
13                 Respondents.         )
                                        )
14  ─────────────────────────────────  )

15          Before the Court is Petitioner Roger Wayne Murray's amended petition for writ of

16  habeas corpus.  Dkt. 40.[1]  Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he was

17  convicted and sentenced to death in violation of the United States Constitution.

18          The amended petition raised fifty-six claims for relief.  The parties have completed

19  their briefing.  Dkts. 111, 114, 117.  Petitioner voluntarily withdrew Claims 43, 47, 49-52

20  and 54-56 as duplicative of other claims.  Dkt. 56.  In an order denying Petitioner's requests

21  for evidentiary development, the Court dismissed Claims 1 (in part), 5 (in part), 6 (in part),

22  7 (in part), 23, 29-33, 35, 36, 40/41(in part), and 44 as procedurally barred, Claims 4, 5, 34,

23  37 (in part), 40/41 (in part), 42, and 48 on the merits, and Claim 37(a) as premature.

24  Dkt. 90.  This Order addresses the procedural status and/or the merits of the remaining

25  claims and concludes, for the reasons set forth below, that Petitioner is not entitled to habeas

26  corpus relief.

27  ─────────────────

28          [1]  "Dkt." refers to the documents in this Court's case file.

**BACKGROUND**

Dean Morrison, age 65, and Jacqueline Appelhans, age 60, lived at and operated a store and restaurant at Grasshopper Junction, a rural area outside of Kingman, Arizona.[2] Around 8:30 or 9:00 on the morning of May 14, 1991, a delivery man arrived at their property and found their bodies lying face down and clad in bathrobes on the living room floor of Morrison's residence.  Both victims had been shot multiple times in the head.

Sometime before 8:00 that morning, police had found one of Morrison's tow trucks abandoned on Interstate 40 westbound near Kingman.  At approximately 8:00 that morning, police also had arrested Petitioner and his older brother, Robert, on unrelated charges.  The arrests occurred on eastbound I-40 near Holbrook, Arizona.  When arrested, the Murrays had in their possession firearms and other evidence linking them to the murders at Grasshopper Junction.

When officers arrived to investigate the murder scene, they found a revolver on the couch and a .22 semiautomatic rifle leaning against the wall.  Shotgun pellets and various .22- and .38-caliber bullets, casings, and shells were found near the bodies.

Drawers in the living room had been pulled open and the contents strewn about.  The bedrooms and kitchen were ransacked.  A cushion cover was missing from the couch.  There was a .303 rifle on a bed and $172 on a desk chair.  Loose change and a single roll of coins were on the kitchen floor.  Morrison's wallet, undisturbed in the pocket of his pants, contained $800.

The drawer from the store's cash register had been removed.  Packs of Marlboro cigarettes were left in paper bags in the store, and the gasoline register was turned on. Police found Morrison's glasses, a flashlight, and a set of keys on the patio of the store. Three live .38-caliber bullets were found near the gas pumps.  Morrison's sister found a

---

[2] Except where otherwise indicated, this factual summary is taken from the decision of the Arizona Supreme Court in *State v. Murray*, 184 Ariz. 9, 20-21, 906 P.2d 542, 553-54 (1995).

1   fired .25 bullet in the pantry two weeks after the crime.

2       Detective Dale Lent of the Mohave County Sheriff's Department documented the

3   tracks around the scene.  He found four sets of footprints, two of which were made by the

4   victims.  Of the other sets, one was made by a pair of cowboy boots, consistent with those

5   worn by Robert Murray, the other by a pair of tennis shoes, consistent with those worn by

6   Petitioner.  Officers photographed and sketched the footprints. Other than the shoe prints

7   of the officers and victims, the Murrays' footprints were the only prints to enter or leave the

8   crime scene.   One trail showed three sets of prints: the tennis shoes, the boots, and

9   Morrison's slippers.  The prints suggested that Morrison had resisted his attackers.

10      Rolled and loose coins were found in the courtyard amidst footprints of the victims

11  and the Murrays. Both brothers' footprints, as well as Morrison's, were found near a

12  backhoe, along with tire tracks later determined to be from the tow truck found on

13  westbound I-40.

14      On the morning of their arrest, the Murrays were driving eastbound on I-40 in a 1988

15  Ford Tempo with Alabama plates.  For reasons unrelated to the homicide and not disclosed

16  to the jury, an officer attempted to stop them.  With Robert driving, the Murrays fled in their

17  car, reaching speeds in excess of 85 miles an hour, leaving the highway, running a manned

18  and armed roadblock, and stopping off-road only when a wash blocked their way.  As they

19  exited the vehicle, Robert Murray tossed away a .38 revolver that contained four bullets;

20  Petitioner threw out a loaded .25 semiautomatic pistol.  Robert Murray had two spent

21  shotgun shell casings in his hip pocket.

22      Inside the vehicle, officers found a loaded twelve gauge sawed-off shotgun along

23  with live double-ought buckshot shells.   There was also a checkered cushion cover,

24  matching the cushion on Morrison's couch, which contained rolled coins stamped with the

25  name and address of Morrison's business, along with a pillow case containing

26  approximately $1400 in coin rolls and $3300 in cash.  Gloves were found, as well as a

27  receipt from the Holiday House Motel in Kingman, dated May 12, 1991.  Motel records

28

showed that the brothers had listed a 1988 Ford on the hotel registration card and had checked out on May 13.  A road atlas was found in the car with circles were drawn around the locations of two rural shops or restaurants, including Grasshopper Junction, that were not otherwise indicated on the map.

Keys recovered from Robert Murray's pocket were later determined to fit a 1991 Chevy Pickup that was on Morrison's property.  A scanner found in the Murrays' car fit the empty bracket of the tow truck found on westbound I-40.

Morrison's autopsy revealed that he had suffered a shotgun blast that entered behind his left ear from a distance of about three feet, shattering his skull.  He also suffered two gunshot wounds from a large caliber pistol, one entering the left lower neck, the other the right temple.  A .38 bullet was recovered from the back of his neck.  Large caliber buckshot was removed from his head.  A fired .38 bullet was found next to Morrison.  Morrison also had lacerations and abrasions on his face, elbow, forearm, knee, and thigh.  These injuries occurred in the same time frame as the gunshot wounds.

Appelhans was shot with at least three different guns.  Her head had been shattered by a blast from a shotgun.  Brain and scalp tissue were found on the couch and the surrounding area.  Two .38-caliber slugs were removed from her skull.  She also suffered .22-caliber wounds that entered at the back of the neck and exited her face.  A fragment of one of the .22 bullets was found in her right hand.  An aspiration hemorrhage in her lungs suggested a lapse of time between the initial gunshot and death.  The .38-caliber bullets were a possible cause of death, and the shotgun blast was clearly lethal.  The effect of the .22 shots could not be determined, and the autopsy did not reveal the sequence of the shots.

Casings found at the crime scene and in Robert Murray's pocket were fired by the three guns found with the Murrays.  Other bullets, slugs, and casings were inconclusive as to the weapons that fired them; some had characteristics that were consistent with being fired by the weapons.

Human blood and tissue were found on Robert Murray's shirt, on his brother's pants,

and on the cushion cover.  The blood on Petitioner's pants could have come from either victim or Robert Murray, but not from Petitioner.  The blood on Robert Murray's shirt was consistent with that of either victim, but not with the blood of Petitioner or Robert.  The blood on the cushion could have come from Appelhans, but not from Morrison or the Murrays.  DNA tests were not conducted.

The brothers were tried together.  On June 12, 1992, a jury convicted them of the first degree murders of Morrison and Appelhans and the armed robbery of Morrison.  The first degree murder verdicts were unanimous for both premeditated and felony murder.  Following bifurcated sentencing hearings, the trial court found that the State had proven three aggravating circumstances as to each defendant:  the murders were committed for pecuniary gain, pursuant to A.R.S. § 13-703(F)(5); the murders were especially heinous, cruel or depraved, under § 13-703(F)(6); and the defendants committed multiple homicides, under § 13-703(F)(8).  With respect to each defendant, the trial court found insufficient mitigation to warrant leniency.  The Arizona Supreme Court affirmed the convictions and death sentences.  *State v. Murray*, 184 Ariz. 9, 906 P.2d 542 (1995).

On March 9, 1999, Petitioner filed a petition for postconviction relief ("PCR").  The PCR court[3] summarily rejected or found precluded most of Petitioner's claims, but it appointed a psychologist and neuropsychologist to evaluate Petitioner preparatory to an evidentiary hearing to be held on two ineffective assistance of counsel ("IAC") claims, alleging that trial counsel (1) slept during portions of the trial and (2) failed to obtain neurological or neuropsychological testing for purposes of mitigation at sentencing.  PCR Order filed 1/10/00.[4]  Following examination by the appointed experts, Petitioner notified

---

[3] The Honorable James E. Chavez presided over both the trial and the PCR proceedings.

[4] "PCR" refers to documents contained in the three-volume record from Petitioner's post-conviction proceedings (Case No. Mohave CR-13057).  "PR doc." refers to enumerated documents contained in the three-volume record on appeal from Petitioner's post-conviction proceedings (Case No. CR 01-0146-PC).  "ROA" refers to the one-volume record in

the PCR court that he did not intend to rely on those experts.  PCR Notice filed 12/18/00.
The PCR court granted the Respondents' motion to dismiss the second IAC claim and held
an evidentiary hearing on the first.  PCR Order filed 4/16/01.  Following the evidentiary
hearing, the PCR court denied relief on that claim and dismissed the petition.  PCR Order
filed 3/21/02.

The Arizona Supreme Court summarily denied a Petition for Review except as to
Petitioner's claim that he was entitled to a jury determination of aggravating factors.  PR
docs. 29, 30.  With respect to that claim, the Arizona Supreme Court consolidated review
with claims of other similarly-situated inmates and subsequently denied relief, *see State v.
Towery*, 204 Ariz. 386, 64 P.3d 828 (2003).  PR doc. 37.  The court thereafter denied
Petitioner's motion for reconsideration.  PR doc. 40.  Petitioner filed a petition for writ of
certiorari, which he later withdrew.  PR docs. 42, 43.  Petitioner then initiated these
proceedings.  Dkt. 1.

## PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

A writ of habeas corpus may not be granted unless it appears that a petitioner has
exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.
Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly
present" the operative facts and the federal legal theory of his claims to the state's highest
court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848
(1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78
(1971).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust
federal constitutional claims: direct appeal and post-conviction relief proceedings.  Rule 32
of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a
petitioner is precluded from relief on any claim that could have been raised on appeal or in

---

Petitioner's direct appeal (Case No. CR-92-0441-AP).  "RT" refers to the reporter's
transcripts.   "ME" refers to the minute entries of the trial court.

a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its preclusion rules such that they are an adequate bar to federal review of a claim. *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (finding Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (same).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz*, 149 F.3d at 931 (district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the

1  failure to properly exhaust the claim in state court and prejudice from the alleged
2  constitutional violation, or shows that a fundamental miscarriage of justice would result if
3  the claim were not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.
4  Petitioner does not assert that either cause and prejudice or a fundamental miscarriage of
5  justice excuses the procedural default of any claim at issue in this Order.

6                          **AEDPA STANDARD FOR RELIEF**

7        Petitioner's habeas claims are governed by the Antiterrorism and Effective Death
8  Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA
9  established a "substantially higher threshold for habeas relief" with the "acknowledged
10 purpose of 'reducing delays in the execution of state and federal criminal sentences.'"
11 *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538
12 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-
13 court rulings' . . . demands that state-court decisions be given the benefit of the doubt."
14 *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333
15 n.7).

16       Under the AEDPA, a petitioner is not entitled to habeas relief on any claim
17 "adjudicated on the merits" by the state court unless that adjudication:

18       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
19       Court of the United States; or

20       (2) resulted in a decision that was based on an unreasonable determination of
         the facts in light of the evidence presented in the State court proceeding.

21 28 U.S.C. § 2254(d).

22       The phrase "adjudicated on the merits" refers to a decision resolving a party's claim
23 which is based on the substance of the claim rather than on a procedural or other non-
24 substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant
25 state court decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*,
26 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04
27 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

28
                                        - 8 -

1      "The threshold question under AEDPA is whether [the petitioner] seeks to apply a

2  rule of law that was clearly established at the time his state-court conviction became final."

3  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

4  (d)(1), the Court must first identify the "clearly established Federal law," if any, that

5  governs the sufficiency of the claims on habeas review.  "Clearly established" federal law

6  consists of the holdings of the Supreme Court at the time the petitioner's state court

7  conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649,

8  653 (2006);  *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot

9  be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional

10  principle advanced by a petitioner, even if lower federal courts have decided the issue.

11  *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896,

12  907 (9th Cir. 2004).  Nevertheless, while only Supreme Court authority is binding, circuit

13  court precedent may be "persuasive" in determining what law is clearly established and

14  whether a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

15      The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

16  The Court has explained that a state court decision is "contrary to" the Supreme Court's

17  clearly established precedents if the decision applies a rule that contradicts the governing

18  law set forth in those precedents, thereby reaching a conclusion opposite to that reached by

19  the Supreme Court on a matter of law, or if it confronts a set of facts that is materially

20  indistinguishable from a decision of the Supreme Court but reaches a different result.

21  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

22  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

23  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

24  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

25  clause."  *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

26      Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

27  may grant relief where a state court "identifies the correct governing legal rule from [the

28

Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the

state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

## I.    PROCEDURAL DEFAULT ANALYSIS

Respondents contend that Claims 24, 26, 27, 28, 39, and 53 were not properly exhausted.  The Court will address the procedural status of those claims, as well as the claims withdrawn from the amended petition.  Respondents concede that Claims 1, 2, 3, 6, 7, 10-18, 22, 38, and 45 were, in whole or in part, exhausted in state court.  Dkt. 46.  The Court will discuss the merits of those claims later in this Order.

### A.    Claims 24, 26, 27, 28, 39, and 53

These claims, which primarily challenge aspects of Arizona's death penalty statute, were raised in Petitioner's first PCR proceeding.  PCR pet. filed 3/5/99 at 24-30; PR doc. 7 at 32.  The PCR court found the claims precluded under Rule 32.2(a)(3) because they could have been raised on direct appeal.  PCR order filed 1/10/00.  Because the Arizona Supreme Court summarily denied review of the claims (PR doc. 30), this Court "looks through" that denial to the PCR court's decision as the last reasoned state court ruling.  *See Ylst*, 501 U.S. at 803.  Thus, the claims are procedurally defaulted pursuant to the PCR court's Rule 32.2(a)(3) finding of preclusion.  *Coleman*, 501 U.S. at 729-30.  Petitioner has not attempted to show cause and prejudice or a fundamental miscarriage of justice to excuse the default.  Accordingly, Claims 24, 26, 27, 28, 39, and 53 are dismissed as procedurally

1 | barred.[5]

2 | **B.    Claims withdrawn from the amended petition**

3 | In his traverse, Petitioner requested that the Court allow him to "dismiss without
4 | prejudice" Claims 8, 9, 20, 21, 25, and 46.[6]   Dkt. 56 at 21, 28-30, 46.

5 | These claims are procedurally defaulted.  Petitioner raised Claims 8 and 9 on direct
6 | appeal.  Opening Br. at 25-30.  The claims challenged the trial court's rulings on Detective
7 | Lent's testimony, but alleged only violations of state evidentiary rules, not federal law.  *Id.*
8 | Petitioner failed to present Claims 20, alleging improper use of victim impact evidence, and
9 | 25, challenging the burden of proof set forth in Arizona's death penalty statute, in state
10 | court.   He raised Claim 21, challenging the state courts' application of the aggravating
11 | factors, on direct appeal, but did not present a federal constitutional claim, arguing only that
12 | the factors had not been established pursuant to state law.  *Id.* at 55-60.  Finally, Petitioner
13 | raised Claim 46, alleging IAC at sentencing based on counsel's failure to elicit testimony
14 | from his psychiatric expert, in his PCR petition, but did not include the claim in his petition
15 | for review to the Arizona Supreme Court.  PCR pet. filed 3/5/99 at 12-15; PR doc. 7.

16 | Petitioner does not assert that any of the exceptions to Rules 32.2(a)(3) and 32.4
17 | apply to these claims.  Therefore, he is now barred from obtaining relief on the claims in
18 | state court.  The claims are technically exhausted but procedurally defaulted.  Petitioner has
19 | not attempted to show cause and prejudice or a fundamental miscarriage of justice to excuse
20 | the default.  Accordingly, Claims 8, 9, 20, 21, 25, and 46 are dismissed as procedurally
21 | barred.

22 |
23 | 
24 | [5] Although they are procedurally barred, the Court has reviewed the claims and
determined that they are without merit, as is Claim 25.  *See Smith v. Stewart*, 140 F.3d 1263,
25 | 1272 (9th Cir. 1998).

26 | [6] In its Order denying Petitioner's motion for evidentiary development, the Court
considered the procedural status of several other withdrawn claims.  Dkt. 90 at 9-14; *see* Dkt.
27 | 71.

28 | - 12 -

1    **II.     MERITS ANALYSIS**

2         **A.     Claim 1**

3         Petitioner alleges that his rights under the Sixth and Fourteenth Amendments were

4    violated by the trial court's denial of his motion to change venue.  Dkt. 40 at 43-49; *see* Dkt.

5    56 at 7-10.

6         1.    Background

7         On April 15, 1992, Petitioner filed a motion for change of venue arguing that he

8    would be unable to receive a fair trial in Mohave County based on pre-trial publicity.

9    ROA 92.  The trial court held an evidentiary hearing on April 22, 1992.  At the hearing,

10   David Hawkins, a news director and reporter at radio stations in Mohave County, provided

11   the scripts of the approximately sixty news reports he had written about the case in the year

12   since the murders.   ROA, Index of Exhibits, 4/22/92.   Hawkins also described his

13   observations of the community's feeling about the case, testifying that people were angry

14   about what had happened to the victims.  RT 4/22/92 at 24.  He also indicated that, based

15   on his contacts with a "couple dozen" individuals, mostly people in the legal community,

16   the general opinion was that the Murrays were guilty of the murders.  *Id.* at 24-25.  Hawkins

17   was unable to provide information regarding the circulation of the newspapers or the

18   listening audience of the radio stations.  *Id.* at 38-39.  Along with the news scripts prepared

19   by Hawkins, defense counsel submitted copies of eight articles from the Kingman Daily

20   Miner newspaper.  ROA, Index of Exhibits, 4/22/92.

21        John Collier Freeman, an investigator for the Mohave County Legal Defender's

22   Office, also testified at the hearing.  According to Freeman, in the course of his investigative

23   duties he had spoken about the case to approximately 100 people in the county (RT 4/22/92

24   at 47) and had received a number of unsolicited comments on the case from a cross-section

25   of the community (*id.* at 42-43).  Freeman testified that most of the people who expressed

26   an opinion believed that the brothers were guilty.  *Id.* at 43-44.

27        At the close of the hearing, defense counsel asked the court to defer ruling on the

28

                                    - 13 -

1   motion until the results of the juror questionnaires were available.  *Id.* at 102.  While

2   agreeing to reserve its ruling, the court noted:

3          Well, based on the evidence I have heard today, I'm not convinced that
       a change of venue is required.  First of all, this is – probably most people
4      would call this a rural county, but I agree with the State, there are three
       separate metropolitan areas.  There is an abundance of news sources in those
5      areas, and I'm not convinced that we cannot find, out of the population of this
       county, a fair and impartial jury. . . .[I]f we have difficulty finding a jury out
6      of the jury pool, then I may take up that motion again, but based on the
       evidence I've heard today I don't think the defendants have carried the burden
7      of proof.

8   *Id.* at 110-11; *see* ME 4/22/92 at 2.

9          After voir dire of the jury panel, the trial court again denied the request for a change

10  of venue, explaining:

11         I don't see that there's any need for further discussion on it.  We were
       able to impanel a jury.  My assessment is probably not real accurate, but my
12     recollection is that there were probably half the people or less that knew about
       the case, and most of them had trouble recounting much about it.  So, jury
13     selection went – was much easier than I anticipated based on the amount of
       media coverage.

14

15  RT 5/29/92, Vol. II, at 24.

16         On direct appeal, the Arizona Supreme Court rejected Petitioner's claim that he was

17  entitled to a change of venue, finding that he had demonstrated neither presumed nor actual

18  prejudice resulting from pretrial publicity.  *Murray*, 184 Ariz. at 26, 906 P.2d at 559.  In

19  rejecting Petitioner's claim of presumed prejudice, the court explained:

20         For a court to presume prejudice, defendant must show "pretrial
       publicity so outrageous that it promises to turn the trial into a mockery of
21     justice or a mere formality."  *Bible,* 175 Ariz. at 563, 858 P.2d at 1166.  To
       reach a conclusion on presumed prejudice, we review the entire record,
22     without regard to the answers given in voir dire.  *Id.* at 565, 858 P.2d at 1168.

23         Defendants did not meet their burden of proof to show that "the
       publicity has been so extensive and so prejudicial as to create the probability
24     that [they] will be denied a fair trial."  *State v. Smith*, 116 Ariz. 387, 390, 569
       P.2d 817, 820 (1977).  Defendants called a news reporter and investigator as
25     witnesses before trial to attempt to show that pretrial publicity prejudiced
       defendants because various people in the community had formed opinions
26     about their guilt or innocence.  However, they failed to show *what* pretrial
       publicity was so outrageous, resulting in a trial that was "utterly corrupted."
27     *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589
       (1975).

28

                                    - 14 -

1  *Id.*  The court also found that Petitioner failed to show actual prejudice because only those

2  prospective jurors who indicated that they could set aside the publicity and decide the case

3  on the evidence remained on the jury panel, and the jury was warned repeatedly to avoid

4  media coverage of the trial.  *Id.*

5       2.   Analysis

6       A criminal defendant is entitled to a fair trial by "a panel of impartial, 'indifferent'

7  jurors."  *Irvin v. Dowd,* 366 U.S. 717, 722 (1961).  "[I]f pretrial publicity makes it

8  impossible to seat an impartial jury, then the trial judge must grant the defendant's motion

9  for a change of venue."  *Casey*, 386 F.3d at 906 (citing *Harris v. Pulley*, 885 F.2d 1354,

10  1361 (9th Cir. 1988)).

11       The Supreme Court has discussed two types of prejudice resulting from pretrial

12  publicity:  presumed prejudice, where the setting of the trial is inherently prejudicial, and

13  actual prejudice, where voir dire is inadequate to offset extensive and biased media

14  coverage.  *See Murphy v. Florida*, 421 U.S. 794, 798 (1975).  Petitioner appears to be

15  arguing only that the state courts should have found presumed prejudice.[7]  A court presumes

16  prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage,"

17  *Dobbert v. Florida,* 432 U.S. 282, 303 (1977), or a "wave of public passion that would make

18  a fair trial unlikely by the jury," *Patton v. Yount,* 467 U.S. 1025, 1040 (1984).  The

19  presumption of prejudice is "rarely applicable and is reserved for an 'extreme situation.'"

20  *Harris*, 885 F.2d at 1361 (internal citations omitted).  The Supreme Court has found

21  presumed prejudice in only three cases:  *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes*

22  *v. Texas*, 381 U.S. 532, 536 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

23       While Petitioner's case generated substantial media interest, the nature of the

24  coverage is distinguishable from the publicity present in cases where prejudice has been

25

26       [7] Petitioner does not appear to argue actual prejudice.  This Court finds, nonetheless,

27  that the decision of the Arizona Supreme Court on direct appeal rejecting actual prejudice
was neither contrary to nor an unreasonable application of clearly established federal law.

28

presumed.  Most significantly, the media coverage of Petitioner's case was neither as pervasive nor as inflammatory as in cases where the Supreme Court found presumptive prejudice, including *Rideau* and *Sheppard*, where the Court overturned state-court convictions because the trial atmosphere had been "utterly corrupted" by the media.[8] *Murphy*, 421 U.S. at 798.

In *Rideau*, the defendant's detailed twenty-minute confession was broadcast on television three times.  373 U.S. at 724.  In a community of 150,000, nearly 100,000 people saw or heard the broadcast.  *Id.*  "What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff."  *Id.* at 725.  As the Supreme Court explained, the televised confession "*was* Rideau's trial," and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726 (emphasis added).

In *Sheppard*, "massive, pervasive and prejudicial publicity" prevented the defendant from receiving a fair trial.  384 U.S. at 335.  Much of the publicity was not fact-based or objective, but sensational and openly hostile.  For example, articles "stressed [Sheppard's] extra marital love affairs as a motive for the crimes," while editorials characterized him as a liar and demanded his arrest.  *Id.* at 340-341.  Other news stories described evidence that was never produced at trial.  *Id.* at 340.

---

[8] In the third case, *Estes*, the Court found presumptive prejudice based on the trial's carnival-like atmosphere.  A pretrial hearing was televised live and then replayed, with the broadcasts reaching 100,000 viewers.  *Estes*, 381 U.S. at 550.  During the hearing, "the courtroom was a mass of wires, television cameras, microphones and photographers.  The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses, and the lawyers were all exposed to this untoward situation."  *Id.* at 550-51.  The Supreme Court found that such media intrusion was inherently prejudicial due to its effect on the witnesses, the judge, the defendant, and, most significantly, on the "televised jurors."  *Id.* at 545.  Such intrusive courtroom coverage is not an issue in Petitioner's case.

In support of this claim, Petitioner cites *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir.1985), in which the Eleventh Circuit found presumed prejudice based on pretrial publicity. Dkts. 40 at 48, 56 at 7-8. The publicity at issue in *Coleman*, however, is clearly different in both quantity and quality from the media coverage of the Murrays' case.

In *Coleman*, four defendants were charged with a series of brutal crimes culminating in the execution-style murder of six members of a family. 778 F.2d at 1488. The trial venue was a rural county of approximately 7,000. *Id.* at 1491. The victims were prominent and popular members of the community from which the jury pool was selected, and it was revealed at voir dire that several of the seated jurors personally knew the victims and one had attended the funeral of five of the victims. *Id.* at 1539. At an evidentiary hearing held on remand, the petitioner presented the court with more than 150 newspaper articles written about his case before or during his trial, many of which were hostile and inflammatory and one of which included a statement by the county sheriff that he would like to "precook" the petitioner before he was electrocuted; he also offered witness statements indicating that the case was a main topic of conversation for an extended period of time. *Id.* at 1491-1537. Local citizens and reporters testified that the community had irrevocably made up its mind as to the guilt of the defendants and the appropriate penalty. *Id.* at 1539. In sum, "everyone" in the close-knit community from which the jury was drawn "knew that [the defendants] were guilty and everyone knew they should be electrocuted." *Id.*

The publicity in Petitioner's case presents a stark contrast with the media excesses that presumptively deprived the defendants of a fair trial in *Rideau*, *Sheppard*, and *Coleman*. Most of the media coverage identified by Petitioner reported on the crime and the Murrays' arrest, indictment, and trial. ROA, Index of Exhibits, 4/22/92. Although some of the reports recounted evidence found with the Murrays or at the scene, and included law enforcement statements about the crime and how it was perpetrated, these reports appear to have been factual rather than inflammatory. *See Gallego v. McDaniel*, 124 F.3d 1065, 1071 (9th Cir. 1997) (factual accounts of pretrial events did not constitute "prejudicial and inflammatory"

news coverage requiring a change of venue). Two Kingman newspaper stories and some radio stations reported that the Murrays were wanted for the robbery and assault of a 76-year-old woman in Alabama and were suspects in a cross-country crime spree. These press reports, while clearly warranting careful voir dire and jury selection, do not rise to the level of the repeatedly-televised confession in *Rideau* or the "massive, pervasive and prejudicial publicity" in *Shephard*.[9]  384 U.S. at 335.

"'Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because 'saturation' defines conditions found only in extreme situations.'" *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.), *as amended*, 152 F.3d 1223 (9th Cir. 1998) (quoting *United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir. 1996)). The Court's review of the evidence suggests that this was not an extreme situation. The media coverage was largely factual. The press coverage clearly warranted careful jury selection, but it was not so extensive and inflammatory that the trial court must have presumed the jury would be prejudiced. The Court concludes that Petitioner's trial was not one of those rare cases where pretrial publicity rendered the trial a "hollow formality." *Rideau*, 373 U.S. at 726.

The Court also rejects Petitioner's contention that the Arizona Supreme Court employed an erroneous standard when assessing presumed prejudice. Dkt. 56 at 8-11. The court correctly cited United States Supreme Court precedent, *Murphy*, 421 U.S. at 798, for

---

[9] Petitioner's reliance on the case of *Murphy v. Florida* (Dkt. 56 at 9-11) is also unavailing. In *Murphy*, the Supreme Court found no prejudice despite extensive, even national, pretrial publicity and the fact that 20 of 78 prospective jurors were excused after indicating that they had an opinion as to the petitioner's guilt and all of the jurors had some knowledge of his past crimes. 421 U.S. at 800-03. Nevertheless, because voir dire indicated that an impartial jury had been seated, and because the atmosphere of the community and courtroom was not "sufficiently inflammatory," the petitioner was unable to show either presumed or actual prejudice. *Id.* Given the factual nature of the press coverage and the ease with which the trial court was able to seat an impartial jury, Petitioner's case bears a closer resemblance to *Murphy* than to *Rideau* or *Sheppard*.

the proposition that prejudice from pretrial publicity may be presumed where the media coverage was so outrageous that the trial was "utterly corrupted." *Murray*, 184 Ariz. at 26, 906 P.2d at 559.  The court also cited its own holdings in *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), and *State v. Smith*, 116 Ariz. 387, 569 P.2d 817 (1977).  *Id*.  *Bible* and *Smith*, in turn, relied on *Murphy*, *Rideau*, *Sheppard*, *Estes*, and other Supreme Court precedent for their analysis of presumed prejudice.  *Bible*, 175 Ariz. at 564, 566, 858 P.2d at 1167, 1169; *Smith*, 116 Ariz. at 390, 569 P.2d at 820.  The Arizona Supreme Court applied the correct standard in analyzing the issue of presumed prejudice, evaluating whether the pretrial publicity was of such a nature that Petitioner could not have received a fair trial.  *Murray*, 184 Ariz. at 26, 906 P.2d at 559.  It is also clear that the court did not, as Petitioner asserts, ignore the evidence of pretrial publicity.  Rather, it reasonably determined that the evidence presented by Petitioner did not show that the publicity was so extensive and inflammatory that prejudice could be presumed.

Finally, the Court rejects Petitioner's contention that a "different standard" applies to change of venue motions in capital cases.  Dkt. 40 at 48.  The Unites States Supreme Court has made no such distinction.  In *Dobbert*, for example, the Court affirmed the petitioner's death sentence, applying *Murphy*'s "utterly corrupted" standard for presumed prejudice to reject the claim that the petitioner was denied a fair trial due to extensive media coverage of his case.  432 U.S. at 302; *see also Harris*, 885 F.2d at 1360-61 (applying *Murphy*, *Rideau*, *Sheppard*, and *Estes* in habeas review of capital case).

The Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting Petitioner's claim of presumed prejudice, nor was its decision based on an unreasonable determination of the facts.  Petitioner is not entitled to relief on Claim 1.

**B.    Claim 2**

Petitioner alleges that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's failure to sequester the jury.  Dkt. 40 at 49-51; *see* Dkt. 56 at 12.

1.    Background

Petitioner moved to sequester the jury from voir dire through deliberations in order to prevent exposure to prejudicial publicity. ROA 142. Co-defendant Robert Murray joined the motion. RT 5/27/92 at 16. The court held a hearing and denied the motion. RT 5/27/92 at 21; ME 5/27/92.

The Arizona Supreme Court rejected the claim that Petitioner was entitled to a sequestered jury:

> Sequestration of a jury is within the discretion of the trial court, Ariz.R.Crim.P. 19.4, and a trial court's ruling on the subject will not be disturbed on appeal absent a showing of an abuse of discretion and resulting prejudice to the defendant. *State v. Schad*, 129 Ariz. 557, 568, 633 P.2d 366, 377, *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1981). Any first degree murder trial is likely to require some added security around the court house. Such security does not require the court to sequester the jury.
>
> Regarding trial publicity, the court repeatedly admonished the jury to avoid media coverage during the trial. Defendant has not shown, or even claimed, that the jurors did not follow the court's admonitions. *See Bible*, 175 Ariz. at 574, 858 P.2d at 1177. The trial court did not abuse its discretion in denying defendants' motion for sequestration of jurors.

*Murray*, 184 Ariz. at 32-33, 906 P.2d at 565-66.

2.    Analysis

Because there is no constitutional right to jury sequestration, failure to sequester a jury does not warrant federal habeas relief in the absence of demonstrated prejudice. *Powell v. Spalding*, 679 F.2d 163, 166 & n.3 (9th Cir. 1982) (although failure to sequester jurors during deliberation violated state statute, petitioner not entitled to relief because he failed to show prejudice); *see Drake v. Clark*, 14 F.3d 351, 358 (7th Cir. 1994); *Livingston v. Hargett*, 9 F.3d 1547, 1547 (5th Cir. 1993).

Petitioner cites a number occurrences in support of his contention that he was prejudiced by the court's failure to sequester the jury. Dkt. 40 at 49-51. These include the jurors' exposure to the security measures employed during the trial, an incident in which police officers made derogatory comments about the defense strategy outside the courtroom, a conversation participated in by the prosecutor which two jurors may have overheard

during a smoke break outside the courthouse, and the fact that a juror's spouse attended the trial. *Id.*

Petitioner's concerns are not well taken. He has not explained how, and no evidence suggests that, sequestration would have prevented the jurors from being exposed to the security measures or from overhearing comments made in and around the courthouse. Further, Petitioner has not shown that he was prejudiced by the incidents, each of which was addressed by the trial court.

After hearing testimony from the officers involved, the court determined that the jurors were not exposed to their comments, which took place in the law library with the door closed and in any event did not refer to evidence in the case (RT 6/4/92, Vol. I, at 13). *See Murray*, 184 Ariz. at 35, 906 P.2d at 568. The conversation possibly overheard by jurors during a smoke break consisted of the prosecutor jokingly apologizing to a state's witness for a misstatement made in one of the prosecutor's questions. RT 6/9/92, Vol. II, at 107-08. The prosecutor himself brought the incident to the court's attention and the court, without objection from defense counsel, indicated that it would again admonish the jurors and would ask the bailiff to keep better track of the jurors. *Id.* at 109-11. At the end of the trial, Petitioner's counsel notified the court that the wife of one of the jurors had been attending the trial. RT 6/12/92 at 3. The court questioned the juror, who explained that he and his wife had obeyed the court's admonition and had not discussed the case. *Id.* at 6-7. The juror was drawn as an alternate and did not deliberate on the verdict. *Id.* at 43. Petitioner cannot show that he was prejudiced by any of these occurrences.

Finally, while Petitioner again discusses the high-profile nature of the case, he cites no authority for the proposition that a jury must be sequestered simply because a case has been the subject of publicity, and he makes no assertion that any of the jurors who actually sat on his case disobeyed the court's admonition or were exposed to press coverage during the trial.

The Court concludes that Petitioner is not entitled to relief on Claim 2.

**C.   Claim 3**

Petitioner alleges that his due process rights were violated by the trial court's denial of his severance motion.  Dkt. 40 at 52-57; *see* Dkt. 56 at 12-13.

**1.   Background**

Co-defendant Robert Murray filed a motion to sever his trial from Petitioner's, arguing that he would suffer spillover prejudice from the introduction of evidence regarding Petitioner's disruptive behavior while in jail.  ROA 55.  Petitioner joined the motion, which the court denied after the State avowed it would not use the evidence.  RT 1/14/92 at 12-13; ME 1/14/92.  Petitioner subsequently filed an ex parte motion for severance, citing confidential information regarding the existence of antagonistic defenses and a "classic *Bruton*" problem.  RT 4/17/92; *see* RT 4/22/92 at 122-23.  The court denied the request for severance, finding that Petitioner had presented no information in support and that it was not the proper subject for an ex parte motion.  RT 4/22/92 at 125-26.  Co-defendant filed a renewed motion for severance, citing potential *Bruton* problems if Petitioner were to testify and raise the defense of duress.  ROA 113; RT 5/13/92 at 71-72.  Petitioner joined the motion, citing concerns that one defendant would testify and incriminate the other. RT 5/13/92 at 74-75.  The court took the motion under advisement, but noted that "there's no incompatibility between the defenses as far as I can tell, and the evidence of the State is all directed toward both.  There is no evidence that goes to one and not the other, as far as I know."  *Id.* at 81. The court then denied the motion.  ME 5/18/92.  Late in the trial, co-defendant again moved for severance based on incompatible defenses, asserting that Petitioner's attack on the quality of the investigation allowed the State "to reopen its case during cross-examination of their witnesses."  RT 6/9/92, Vol. II, at 25.  In denying the motion, the court reiterated that the defenses had not been antagonistic: "Both defendants have attacked the investigation, both have pointed out, throughout the State's case, problems they believe the State has had, witnesses, investigation, and I guess that's exactly what [defense counsel are] trying to do with this, and I don't see the inconsistency at this point."

1    RT 6/9/92, Vol. II, at 27.

2         On direct appeal the Arizona Supreme Court rejected the claim that the Murrays were

3    prejudiced by a joint trial:

4              The trial court shall sever the trial when it "is necessary to promote a
         fair determination of the guilt or innocence of any defendant of any offense."
5        Ariz.R.Crim.P. 13.4(a).  Severance will also be granted if the court detects the
         presence or absence of unusual features of the crime or cases that might
6        prejudice the defendant.  *See State v. McGill,* 119 Ariz. 329, 331, 580 P.2d
         1183, 1185 (1978).  Prejudice occurs when (1) evidence admitted against one
7        defendant is facially incriminating to the other defendant, (2) evidence
         admitted against one defendant has a harmful rub-off effect on the other
8        defendant, (3) there is significant disparity in the amount of evidence
         introduced against the defendants, or (4) co-defendants present antagonistic,
9        mutually exclusive defenses or a defense that is harmful to the co-defendant.
         *State v. Grannis,* 183 Ariz. 52, 58-59, 900 P.2d 1, 7-8 (1995).

10
              Defendants failed to show prejudice.  The evidence implicated both
11       defendants equally.  Neither defendant made a statement, testified at trial, or
         presented an antagonistic defense.  *Cf. Bruton v. United States,* 391 U.S. 123,
12       124, 88 S.Ct. 1620, 1621, 20 L.Ed.2d 476 (1968) (confession by
         co-defendant).  Moreover, the jury questionnaire inquired into whether the
13       venire members would have trouble keeping the defendants separate during
         trial.  Those who answered affirmatively were individually questioned by the
14       court and counsel.  At the close of the evidence, the trial court instructed the
         jury:

15
                   You are instructed that you must consider the evidence
16            presented by the State separately as to each of the defendants
              in this case.  You must determine whether or not the State has
17            proved the charges against each defendant beyond a reasonable
              doubt.  If you find that the State has proved its case against one
18            of the defendants but not the other, you must reflect that in your
              verdict.

19
              With such an instruction, the jury is presumed to have considered the
20       evidence against each defendant separately in finding both guilty.  *See Parker
         v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979).
21       The trial judge committed no error in denying the motions to sever.  "[I]n
         cases where the crimes of the two defendants are so intertwined that it is
22       difficult, if not impossible, to separate proof of one defendant's crimes from
         that of the co-defendant's, it would be a waste of resources to require
23       individual trials."  *State v. Wiley,* 144 Ariz. 525, 532, 698 P.2d 1244, 1251
         (1985), *overruled on other grounds by State ex rel. Criminal Div. of Attorney
24       Gen.'s Office v. Superior Court ex rel. Maricopa County,* 157 Ariz. 541, 760
         P.2d 541 (1988).

25   *Murray*, 184 Ariz. at 25-26, 904 P.2d at 558-59 (footnote omitted).

26        2.    Analysis

27   On federal habeas review, the denial of a motion to sever is evaluated on the basis

28

of whether the state proceedings satisfied constitutional due process. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997); *see also Hood v. Helling*, 141 F.3d 892, 896 (8th Cir. 1998). Therefore, to prevail on this claim, Petitioner bears the burden of demonstrating that the denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. *Grisby*, 130 F.3d at 370. Such prejudice may arise where co-defendants assert mutually exclusive or antagonistic defenses, or exculpatory evidence would be available to one defendant if he was tried separately but is unavailable in a joint trial. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993). Prejudice may also occur where evidence is presented that is technically admissible only against the co-defendant but is probative of the defendant's guilt. *Id.* (citing *Bruton*, 391 U.S. 123) (holding that admission of co-defendant's confession inculpating defendant violated Confrontation Clause).

In attempting to establish that he was prejudiced by a joint trial, Petitioner relies on *Zafiro* and *Bruton*. These cases are inapposite.

By definition, mutually antagonistic defenses force the jury to disbelieve the core of one defense in order to believe the core of the other, so that a jury's acceptance of one party's defense precludes acquittal of the other defendant. *See United States v. Rashkovski*, 301 F.3d 1133, 1137-38 (9th Cir. 2002). Mere antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a co-defendant is insufficient to require severance. *See United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996). Similarly, a defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than the evidence against him. *See United States v. Martin*, 866 F.2d 972, 979 (8th Cir. 1989).

In this case, both the trial court and the Arizona Supreme Court determined that the defenses were not antagonistic. *Murray*, 184 Ariz. at 25, 906 P.2d at 558. That determination is supported by the trial record, which demonstrates that the defenses were consistent – both Petitioner and Robert Murray attacked the quality of the investigation,

challenged the time-line, and argued that reasonable doubt existed as to whether the brothers had actually committed the murders as opposed to simply taking possession of the stolen goods after the victims were dead. *See, e.g.*, RT 6/11/92 at 10-35, 37-63. The holding in *Bruton* is equally inapplicable because neither brother testified and no inculpatory statements were introduced.

Finally, given the strength of the evidence against each defendant and the prophylactic measures taken by the trial court, Petitioner cannot demonstrate that he was prejudiced by the joint trial. There was overwhelming evidence that both Petitioner and Robert Murray participated in the murders. The effect of that evidence would not have changed had the trials been severed.

Claim 3 is without merit and will be denied.

**D.   Claim 6**

Petitioner alleges that the trial court improperly denied his *Batson* motion in violation of his rights under the Sixth and Fourteenth Amendments. Dkt. 40 at 63-65; *see* Dkt. 56 at 17-18.

1.   Background

In exercising its peremptory strikes, the State removed the only remaining Hispanic members of the jury panel, Christina Pethers and David Alvarado.[10]  Defense counsel objected pursuant to *Batson v. Kentucky,* 476 U.S. 79 (1986).  RT 5/29/92, Vol. II, at 20. The trial court then required the prosecutor to articulate his reason for the strikes.  The prosecutor first indicated that he was not aware that Pethers was Hispanic, although her maiden name was Garcia.  *Id.* at 21.  He then informed the court:

> [T]he State recently did a major drug investigation of her mother and her mother's brother, Eddie Mallon.  It's a very big case.  Both of those defendants went to jail for a time.  I'm not sure of the status of Mrs. Garcia. From what Mrs. Pethers said, the charge was dismissed.  I believe there's been some sort of negotiated deal, but I am not positive about that.  But, I

---

[10] A third Hispanic juror was removed for cause because he was the trial judge's uncle. RT 5/28/92 at 20, 105.

- 25 -

know both of those people were heavy into drugs.  Both of those people were suspected of being in drugs.  There's a forfeiture action proceeding against Garcia, Mallon.  This being the daughter, I do not believe that she – I don't want her on the jury for those reasons, possible bias.

*Id.* at 21-22.[11]

With respect to Alvarado, the prosecutor explained:

Mr. Alvarado is Hispanic, and it was a close call on that strike.  What I went on is, as Mr. Alvarado told the court, he knows me, I know him.  Not well.  I'm going basically on my personal knowledge of Mr. Alvarado five or six years ago. . . .  I met Mr. Alvarado at social functions, parties, whatnot. I met Mr. Alvarado probably half a dozen times anyway, and had discussions with him. . . . [M]y recollection of Mr. Alvarado is he's a very, very nice person.  He is too nice.  You couldn't get him to disagree with you.  He didn't want to hurt anybody.  He is just indecisive, is my recollection of him.  My strike on him is solely going back to my personal knowledge of meeting him numerous times four or six years ago.

*Id.* at 22.  Based on the prosecutor's explanations, the court denied Petitioner's *Batson* motion:

Well, under *Batson*, of course, the real question is whether the State gives valid race neutral reasons for the strike, and based on the record, my own opinions about those particular jurors, I find that the reasons given by the State are sufficient.  It's difficult to make a *Batson* case when you only have two minorities on the jury, but even with the two I am finding that the reasons are sufficient.  I don't find that there was any racial reasons for the strikes, and the reasons given are consistent with my own assessments of those particular jurors.

*Id.* at 22-23.

On direct review, the Arizona Supreme Court held that the potential bias of Pethers based on the State's criminal investigation of her relatives was "a sufficient reason to peremptorily challenge a juror."  *Murray*, 184 Ariz. at 25, 906 P.2d at 558.  With respect to the strike of Alvarado, the court held that no *Batson* violation occurred "[b]ecause the prosecutor's explanation was based on prior contact with the venire member outside the jury

---

[11] During her individual voir dire, Pethers had indicated that she was familiar with the County Attorney, Bob Moon, through her mother's case, which Moon had prosecuted. According to Pethers, the case had been dismissed and did not go to trial. RT 5/29/92, Vol. I, at 80.  When asked if anything about the prosecution of her mother would affect her ability to sit on the case, Pethers replied, "No."  *Id.* at 80-81.

1    setting, his determination was not 'wholly subjective,'" and because "the trial court's own
2    observations provided . . . objective verification." *Id.*  The supreme court "accept[ed] the
3    prosecutor's reasons as race neutral." *Id.*

4        2.    Analysis

5        In *Batson*, the United States Supreme Court held that the Equal Protection Clause
6    forbids a prosecutor from challenging potential jurors solely on account of their race.  476
7    U.S. at 89.  Hispanics are a cognizable racial group for *Batson* purposes, *Fernandez v. Roe*,
8    286 F.3d 1073, 1077 (9th Cir. 2002) (citing *Powers v. Ohio*, 499 U.S. 400, 409-16 (1991)),
9    and the *Batson* principle applies where, as here, the criminal defendant and the excluded
10   jurors are of different races, *Powers*, 499 U.S. at 409.

11       Under *Batson*, a defendant's challenge to a peremptory strike requires a three-step
12   analysis.  First, the trial court must determine whether the defendant has made a prima facie
13   showing that the prosecutor exercised a peremptory strike on the basis of race.  *See Rice v.*
14   *Collins,* 546 U.S. 333, 338 (2006).  If the showing is made, the burden shifts to the
15   prosecutor to present a race-neutral explanation for the strike.  *Id.*  The trial court then must
16   determine whether the defendant has carried his burden of proving purposeful
17   discrimination.  *Id.*

18       With respect to *Batson*'s second step, while the prosecutor must offer a
19   "comprehensible reason" for the strike, *id.*, the reason need not be "persuasive, or even
20   plausible," *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam).  "So long as the reason
21   is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338; *see Hernandez v. New*
22   *York*, 500 U.S. 352, 360 (1991) (plurality opinion) ("Unless a discriminatory intent is
23   inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

24       Under the third *Batson* step, after the prosecution puts forward a race-neutral reason,
25   the court is required to evaluate the persuasiveness of the justification to determine whether
26   the prosecutor engaged in intentional discrimination.  *Purkett*, 514 U.S. at 768.  The court
27   need not agree with the prosecutor's stated nonracial reason – the question is not whether

28

the reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed. *Hernandez*, 500 U.S. at 365. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotations omitted). Both the Supreme Court and the Ninth Circuit have utilized comparative juror analysis to assess whether a prosecutor's race-neutral explanation for a strike was in fact a pretext for a discriminatory strike. *Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson*'s third step."); *Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006).

Upon habeas review, a petitioner is entitled to relief on a *Batson* claim only if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338. Thus, this Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. In addition, under § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338-39. Therefore, although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42.

The explanations offered by the prosecutor for striking Pethers and Alvarado were not inherently discriminatory and, therefore, were race-neutral under *Batson*. *Id.* at 338. The explanations were also juror-specific and supported by the record. *See Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004). They were not implausible or fantastic. *Purkett*,

514 U.S. at 768.

With respect to the strike of Pethers based on the criminal prosecutions of her close relatives, courts have held that a family member's criminal history constitutes a race-neutral factor for a peremptory challenge. *See United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987), *overruled on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988) ("reasonable" to challenge black juror whose brother was in prison for armed robbery); *United States v. Hendrix*, 509 F.3d 362, 371 (7th Cir. 2007) ("legitimate and race-neutral" for prosecutor to strike prospective African-American jurors who had relatives in prison); *Lamon v. Boatwright*, 467 F.3d 1097, 1102 (7th Cir. 2006) (no showing that the prosecutor's explanation for strike of African-American juror – police report showed contacts at juror's address, she had prosecuted other people with same last name as the juror, and she doubted juror's credibility because he failed to disclose that his relatives had criminal convictions – was a pretext for race discrimination); *Messiah v. Duncan*, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could reasonably have believed that juror who had been prosecuted by his office and who had relatives in prison would be unduly sympathetic to defendant and hostile to the prosecutor); *United States v. Wiggins,* 104 F.3d 174, 176 (8th Cir. 1997) ("the incarceration of a close family member is a legitimate race-neutral reason justifying the use of a peremptory strike"); *United States v. Mathis,* 96 F.3d 1577, 1582 (11th Cir. 1996) ("The record shows that [the potential juror], who is Hispanic, was removed because a close family member of hers had had a cocaine conviction. There was no clear error in allowing the strike.").

The prosecutor's explanation for striking Alvarado, based on first-hand knowledge of the juror's personality which led the prosecutor to believe that Alvarado was indecisive, was likewise race-neutral. *See United States v. Velazquez-Rivera*, 366 F.3d 661, 666 (8th Cir. 2004) (proffered reasons for striking female Hispanic juror – that she was a nurse, was highly educated and therefore might dominate the jury, and appeared particularly kind and sympathetic – were nondiscriminatory and genuine); *Simmons v. Luebbers*, 299 F.3d 929,

941 (8th Cir. 2002) (state appellate court did not make unreasonable determination of fact in concluding that prosecutor's stated reasons for striking African-American juror, including because she was indecisive, were race-neutral and not violative of *Batson*).

Because the prosecutor satisfied the second step of *Batson* by providing race-neutral reasons for striking the Hispanic jurors, the remaining issue is whether the state courts were unreasonable in crediting these explanations. *Rice*, 546 U.S. at 338.

The factual circumstances of the present case are much less drastic than those present in cases like *Miller-El* and *Kesser*. In *Miller-El*, there was evidence of jury shuffling, which placed white jurors ahead of African-American jurors, and disparate questions regarding the ethnicity of the prospective juror. *Miller-El II*, 545 U.S. at 253-263. There was also evidence that a general prosecutorial policy existed by which African-Americans were not to be seated on juries. *Id.* at 253. These circumstances did not exist in Petitioner's case.

In *Kesser*, the prosecutor struck three Native American prospective jurors, describing one of them as "darker skinned" and stating that Native Americans who worked for the tribe were "a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system." 465 F.3d at 357. The prosecutor expressed his concern about the resistence of Native Americans to the criminal justice system and his belief that they may be more tolerant of child molestation because of their affiliation with the tribe. *Id.* The prosecutor struck the one remaining minority member of unknown heritage whom he described as "brown skinned." *Id.* Nothing comparable to these race-based actions was present in the prosecutor's explanations for his strikes of Pethers and Alvarado.

To further assess Petitioner's contention that the strikes were discriminatory and the prosecutor's explanations pretextual, the Court has undertaken a comparative juror analysis to determine if there were non-minority jurors who were similarly situated to Pethers and Alvarado but were not stricken. While several non-minority jurors were acquainted with the prosecutor or had family members who had been criminally prosecuted, upon closer

review these jurors – Tina Bonsang, Warren Ellis, Charlotte Evans, and Everett Jenks – were not similarly situated to Pethers and Alvarado.

During jury selection, one of the defense attorneys informed the court that he represented an individual with the last name Bonsang and requested the court to speak with panel member Tina Bonsang to determine whether there was any relation between the two. RT 9/28/92 at 46. Bonsang informed the court that her brother-in-law was the individual represented by defense counsel and that she was aware that he had "gotten a few DUI's lately." *Id*. at 47. She also informed the court that the fact that her brother-in-law had been prosecuted for DUIs would not affect her ability to sit on the jury. *Id*.

Bonsang's situation is distinguishable from Pethers's. In striking Pethers, the prosecutor reasoned that Pethers would likely exhibit greater bias because her mother and uncle were being prosecuted pursuant to a major drug investigation. RT 9/29/92, Vol. II, at 21-22. Unlike Bonsang, Pethers revealed that she was familiar with the prosecutor in charge of her mother's prosecution. In addition to the criminal action against Pethers's mother, there was also a civil forfeiture action. RT 5/29/92, Vol. I, at 80. Based on this race-neutral information, the prosecutor could reasonably have concluded that Pethers was more likely to harbor bias against the State than Bonsang.

These reasons apply equally with regard to Ellis. Ellis indicated that his son-in-law had been charged with possession of drugs. RT 9/29/92, Vol. I, at 29. He stated that this fact would not affect his "thinking on the criminal justice system." *Id*. Ellis did not indicate how familiar he was with his son-in-law's case or whether he knew the prosecutor. *Id*. He did, however, share his opinion that his son-in-law "got off too easy" (*id*. at 30), a comment which may have suggested to the prosecutor that Ellis did not hold a bias against the government for its prosecution of his relative. Again, this scenario is distinct from that involving Pethers. There was no information that Ellis's son-in-law was charged by the same prosecutor's office, while Pethers's mother was charged by that office, and it was evident from the record that Pethers was familiar with her mother's case and prosecutor.

1    Other jurors were, like Alvarado, personally acquainted with the prosecutor.

2    Prospective juror Charlotte Evans indicated she knew the prosecutor because she and her

3    children delivered his morning paper and they talked on occasion. RT 5/28/92 at 28. Juror

4    Everett Jenks knew the prosecutor because they were lodge brothers.[12] *Id.* at 17. The

5    prosecutor struck Alavardo not because they were acquainted or because Alvarado was

6    friendly, but because he believed Alvarado's indecisiveness would make him an ineffective

7    juror. There is no evidence that the prosecutor had formed a similar conclusion about Evans

8    or Jenks. The Court concludes that the differences between Pethers and Alvarado and the

9    white jurors are substantial enough to render insignificant the results of a comparative juror

10   analysis. *See United States v. Valley*, 928 F.2d 130, 136 (5th Cir. 1991) (explanation for

11   striking black jurors – family member's criminal history – was not pretextual even though

12   it applied to white jurors who were not struck, because there were "race-neutral differences"

13   between the jurors); *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir. 1988) ("Although

14   the prosecutor may have accepted a white juror with some characteristics similar to the

15   black persons he rejected, the prosecutor also gave reasons for his selection that we are

16   unable to evaluate, such as eye contact and demeanor.").

17       3.   Conclusion

18       The prosecutor offered race-neutral explanations for striking Pethers and Alvarado.

19   The burden thereafter shifted to Petitioner to prove that those reasons were pretextual and

20   the strikes discriminatory. Applying *Batson*, the trial court and the Arizona Supreme Court

21   accepted the prosecutor's race-neutral explanations and concluded that Petitioner had failed

22   to meet his burden. On habeas review, "[a] state court's finding of the absence of

23   discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller-El I*,

24   537 U.S. at 339 (explaining that the trial judge can measure the credibility of a prosecutor's

25   race-neutral explanations by reference to several factors, including its personal observations

26

27       [12] The court excused Jenks for cause after he indicated that he would have difficulty
     sitting on the jury because he and victim Dean Morrison had been friends. RT 5/28/92 at 78.

28

of the juror and of "the prosecutor's demeanor; by how reasonable, or how improbable the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy"). Petitioner has not rebutted this presumption with clear and convincing evidence.

Because the state court decision was not an unreasonable application of *Batson*, and because it was not based on an unreasonable determination of the facts in light of the evidence presented, Petitioner is not entitled to relief on Claim 6.

### E.    Claim 7

Petitioner alleges that his due process rights were violated by the trial court's refusal to permit the defense team access to the crime scene. Dkt. 40 at 65-67; *see* Dkt. 56 at 18-21.

Petitioner's trial counsel, Frank Dickey, and two investigators visited the crime scene in May 1991, shortly after the crimes occurred. Later, a second attorney and another investigator were appointed to Petitioner's defense team. On the fourth day of trial, more than a year after the crime was committed, Dickey moved for an order permitting him to revisit the scene with the new members of the defense team, including a crime scene expert. RT 6/4/92, Vol. II, at 79-80. The trial court denied the motion, finding that Petitioner had not demonstrated any substantial need for a second inspection. *Id.* at 85-86.

On direct appeal, the Arizona Supreme Court held that the trial court did not abuse its discretion in denying counsel's request. The court noted, in concurrence with the trial court's findings, that Dickey remained primary counsel, the original investigators were still available, and the crime scene had been cleaned up by Morrison's family.[13] *Murray*, 184

---

[13] In his traverse, Petitioner asserts that the ruling of the Arizona Supreme Court is not entitled to deference under the AEDPA because the court did not address the constitutional basis for the claim and therefore did not adjudicate the claim on the merits. Dkt. 56 at 20. The Court disagrees. The phrase "adjudicated on the merits" means, for purposes of § 2254(d), that the state court has "finally resolve[d] the rights of the parties based on the substance of the claim, rather than on the basis of a procedural or other rule precluding review of the merits." *Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005) (citing *Lambert*, 393 F.3d at 969). But even under de novo review, the Court finds that Petitioner has failed to show he was prejudiced by the trial court's denial of counsel's request to revisit the crime scene.

1    Ariz. at 35, 906 P.2d at 569.

2           To be entitled to relief on a claim alleging denial of access to evidence, a party must

3    show that the evidence was material and that the defense was prejudiced by its loss. *United*

4    *States v. Valenzuela-Bernal*, 458 U.S. 858, 867-70 (1982). Petitioner cannot make such a

5    showing. Given the overwhelming evidence of Petitioner's guilt, there was not a reasonable

6    probability that a second visit to the scene a year after the murders would have produced a

7    different verdict. *See Brower v. Sec'y for Dept. of Corr.*, 137 F. App'x 260 (11th Cir. 2005)

8    (in light of overwhelming evidence of petitioner's guilt, habeas relief not warranted by

9    denial of access to crime scene); *Brown v. Dixon*, 891 F.2d 490, 495 (4th Cir. 1989)

10   (petitioner not prejudiced by denial of request to inspect crime scene because there was no

11   reasonable probability that inspection would have changed outcome of capital murder

12   proceedings in light of the overwhelming evidence of guilt).

13          The assertion that Petitioner suffered any prejudice by the trial court's denial of his

14   motion to revisit the crime scene one year after the events in question is the kind of

15   conclusory allegation, unsupported by a statement of specific facts, that does not warrant

16   habeas relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Claim 7 is without merit and

17   will be denied.

18      **F.    Claim 10**

19          Petitioner alleges that his rights under the Sixth and Fourteenth Amendment were

20   violated when the trial court denied his motion to act as co-counsel in his own defense.

21   Dkt. 40 at 70-71. The Arizona Supreme Court rejected the claim on direct appeal:

22              Hybrid representation involves concurrent or alternate representation
         by both defendant and counsel. *Montgomery v. Sheldon,* 181 Ariz. 256,
23       260-61, 889 P.2d 614, 618-19 (1995). Although the trial court has discretion
         to permit hybrid representation, there is no constitutional or other right to
24       hybrid representation. *Id.* at 260, 889 P.2d at 618; *State v. Rickman,* 148
         Ariz. 499, 504, 715 P.2d 752, 757 (1986).

25                                        . . . .

26              Roger, through his attorney, filed a motion on July 2, 1991, to join as
         co-counsel to his defense, which was rejected by the court. On August 20,
27       1992, after the trial but before sentencing, Roger wanted to fire his attorneys

28
                                          - 34 -

1
2
3
4
5

based on a conflict of interest.   The court ordered that the public defender withdraw as counsel but remain as advisory counsel.  One week later, Roger filed a motion to appoint counsel because of lack of access to legal materials.  At the hearing, the judge heard from counsel about irreconcilable differences and a potential conflict regarding a witness to be called by Robert.  After discussion, the court reappointed the lawyers who had been representing him.  The trial court did not abuse its discretion by denying Roger's motion for hybrid representation.

6

*Murray*, 184 Ariz. at 27, 906 P.2d at 560.

7
8
9

Petitioner does not contend that this ruling is contrary to or an unreasonable application of clearly established federal law; nor does he cite any authority in support of the proposition that a defendant is constitutionally entitled to hybrid representation.

10
11
12
13
14
15
16

In *Faretta v. California*, 422 U.S. 806, 834-35 (1975), the Supreme Court interpreted the right to counsel to encompass "an independent constitutional right" of the accused to represent himself at trial, and thus waive the right to counsel.  The Court subsequently explained that "*Faretta* does not require a trial judge to permit 'hybrid' representation." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Because the ruling of the Arizona Supreme Court was not an unreasonable application of, or contrary to, Supreme Court precedent, Petitioner is not entitled to relief on Claim 10.

17

**G.    Claim 11**

18
19

Petitioner alleges that his due process rights were violated by the admission of gruesome photographs.  Dkt. 40 at 71-73; *see* Dkt. 56 at 21-22.

20

1.    Background

21
22
23
24
25
26
27

Co-defendant Robert Murray filed a motion to exclude all photographic evidence of the victims and the crime scene.  ROA 58.  The court held a hearing and denied the motion, allowing seven photographs to be admitted on the ground that they were probative on the issue of premeditation and not unduly prejudicial.  ME 4/1/92; *see* RT 4/1/92 at 43. Petitioner moved to substitute black-and-white photos for color photos of the victims.  *See* RT 4/1/92 at 34; ROA 88.  The court denied the motion.  ME 4/22/92.  During trial, the defendants objected to the photographs – exhibits 71, 75, 87, 89, 92, 99, and 197 – on the

28

grounds that they were overly prejudicial and cumulative. RT 6/1/92, Vol. I, at 42-61. The trial court overruled all the objections.

On direct appeal, the Arizona Supreme Court found that the trial court did not abuse its discretion in admitting the photographs:

> Exhibit 71 is a color photo of the victims, lying on their stomachs on the living room floor, blood apparent in the head and neck area of Morrison. Exhibit 75 is a color photo of a couch with a pistol on it, with red and white tissue fragments splattered on the cushions. Exhibit 87 shows a table leg, still attached to the table, with apparent scalp hair of Appelhans hanging from the leg and a bone fragment on the carpet. Exhibit 89 is a color photo of the door frame area with red spots splattered on the wall, door, and frame. Exhibit 92 shows Appelhans' head, with the scalp blown away, exposing the brain, with red tissue, bone matter, and blood in the area. Exhibit 99 is a color photo of the couch, one of the cushions out of place, with what appears to be red tissue splattered on the couch and nearby table. Exhibit 197 is a color photo of the back of the two victims' heads, Appelhans' hand clutching the arm of Morrison, blood on her fingers, blood on Morrison's ear, and blood on the floor. A denture from one of the victims is on the floor in the middle of the photo.
>
> The admission of photographs requires a three-part inquiry: (1) relevance; (2) tendency to incite passion or inflame the jury; and (3) probative value versus potential to cause unfair prejudice. *Stokley,* 182 Ariz. at 515, 898 P.2d at 464; *see* Ariz.R.Evid. 401-03. The photographs are relevant if they aid the jury in understanding an issue. Ariz.R.Evid. 401; *State v. Moorman,* 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987). If the trial court finds that the photographs address contested issues and that they have more than technical relevance, the trial court may admit them notwithstanding a tendency to create prejudice. *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). We analyze a trial court's decision on admission of photographs on an abuse of discretion standard. *State v. Amaya-Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).
>
> While exhibit 92, showing Appelhans' head and brain tissue, is arguably inflammatory, it addressed a contested issue. Robert contended that the state did not do a proper investigation, in particular, that lab tests were not conducted on the debris in the room. The state then introduced, over objection, the photo exhibit and the trial court admitted it on the ground that it was fair rebuttal to the cross-examination of Detective Lent. The other photographs were relevant to identifying the victims, their locations, and the manner in which they were killed. *Id.* at 171, 800 P.2d at 1279 ("In prosecuting a crime of this nature, the state must be allowed some latitude to show what actually occurred.").

*Murray*, 184 Ariz. at 28-29, 906 P.2d at 561-62.

2.    Analysis

In general, state law matters are not proper grounds for habeas corpus relief. "[I]t is

- 36 -

not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted). Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts consider it. *Id.*; *see Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (gruesome photos claim "not cognizable" on federal habeas review where petitioner failed to allege fundamental unfairness).

While Petitioner cites no case in which habeas relief was granted based on the admission of gruesome photographs, courts have consistently held that admission of photographs that are "at least arguably relevant and probative" does not violate due process. *Kuntzelman v. Black*, 774 F.2d 291, 292 (8th Cir. 1996); *see Villafuerte v. Lewis*, 75 F.3d 1330, 1343 (9th Cir. 1996) (photos relevant to prove that defendant knowingly restrained the victim); *Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (no due process violation where petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of death, "the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events"); *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (gruesome photos were probative of state's theory that petitioner meticulously dissected victim and did not act in a blind rage); *Willingham v. Mullin,* 296 F.3d 917, 928-29 (10th Cir. 2002) (denying claim that the admission of 22 photos of the murder victim's body was so unduly prejudicial as to render his trial fundamentally unfair, where photos relevant to issue of intent).

As the Arizona Supreme Court explained, the contested photos depicted the crime scene and were relevant to illustrate the State's version of the manner in which the crimes occurred. Even the most graphic of the photos, exhibit 92, was relevant to rebut the defense claim that the investigation was deficient because it failed to analyze certain material; the

photo showed there was no need for analysis because the identity of the material – spattered blood and tissue from Appelhans's head – was readily apparent.

Even if the photographs were improperly admitted, Petitioner was not prejudiced, given the strength of the evidence against him. *See Futch v. Dugger*, 874 F.2d 1483, 1487-88 (11th Cir. 1989) ("because there was overwhelming evidence of guilt, the photograph [showing nude victim's gunshot wounds] was not a 'crucial, critical, highly significant factor' in petitioner's conviction.").

The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled to relief on Claim 11.

### H.    Claim 12

Petitioner alleges that the prosecutor engaged in various acts of misconduct in violation of Petitioner's due process rights.  Dkt. 40 at 73-76; *see* Dkt. 56 at 22-23.

#### 1.    Background

On direct appeal, the Arizona Supreme Court enumerated and rejected each of Petitioner's allegations of prosecutorial misconduct:

> Roger argues that prosecutorial misconduct, in the following instances, denied his right to a fair trial:
>
> (1) A detective's joking about the Federal Bureau of Investigations while testifying.  The objection to the FBI comment was sustained based on irrelevance and the jury was instructed to disregard it.
>
> (2) Discussion by officers in the courthouse library that defendants were using the "fecal defense"-throwing up anything and hoping something sticks.  The trial court thoroughly probed this issue and concluded that there had been no discussion of the evidence and that the jurors were unlikely to have heard the discussion.
>
> (3) The prosecutor's alleged joking with a witness in front of the jury about whether a bartender at the Temple Bar had gone fishing in Mexico.  Defendant waived this issue for failure to object at trial.  *See State v. White*, 115 Ariz. 199, 203, 564 P.2d 888, 892 (1977).
>
> (4) The prosecutor's joking with someone while on a cigarette break about being subpoenaed, while two jurors stood nearby.  The prosecutor himself brought the incident to the court's attention;  neither defendant objected or moved for a mistrial in the trial court.  Thus, defendant waived this issue.

(5) In closing argument, the prosecutor's referring to defendants as "the boys from Alabama." Defendant waived this issue by failing to object at trial. *See State v. Hankins,* 141 Ariz. 217, 224, 686 P.2d 740, 747 (1984).

(6) The prosecutor's stating that a .25 caliber bullet found on the premises had been fired by one of the brothers. The argument was permissible because a ballistics expert found that the bullet matched the pistol Roger threw from the car.

(7) Reference in closing argument by the state to defendants feeling a "sick excitement" in committing the murders. The trial court cautioned the prosecutor and the prosecutor made no more such references.

In addressing allegations of prosecutorial misconduct, an appellate court must determine whether the prosecutor's actions were reasonably likely to have affected the jury's verdict, thereby denying him a fair trial. *Cornell,* 179 Ariz. at 328, 878 P.2d at 1366. Even where the prosecutor has erred, a reversal is not required unless the misconduct affected the jury's ability to judge the evidence fairly. *United States v. Sherlock,* 962 F.2d 1349, 1364 (9th Cir.1989), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Defendant suffered no demonstrable prejudice in any of these instances and failed to show how any of the instances affected the jury's verdict.

*Murray*, 184 Ariz. at 35, 906 P.2d at 568.

2.   Analysis

In his amended petition, Petitioner reiterates the allegations raised on direct appeal, with the exception of the incident involving the comment on a witness having gone fishing in Mexico. Dkt. 40 at 73-76.[14] In its discussion of Claim 2, the Court addressed the second and fourth of the incidents raised on direct appeal and concluded that they did not deprive Petitioner of a fair trial. As explained below, with respect to the remaining allegations, the Court similarly finds that Petitioner is not entitled to habeas relief because he was not prejudiced by the prosecutor's remarks.

The appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory

---

[14] Petitioner also adds a new allegation – that Detective Lent mocked defense counsel by making funny faces in view of the jury. Dkt. 40 at 74-75. This claim was not presented in state court (*see* Opening Br. at 32-35), is not properly exhausted, and will not be considered here.

- 39 -

power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)) (petitioner not entitled to relief in the absence of a due process violation even if the prosecutor's comments were "undesirable or even universally condemned").  Therefore, in order to succeed on this claim, Petitioner must prove not only that the prosecutor's remarks and conduct were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

In determining if Petitioner's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [conduct] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985).  To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998).  In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and "the weight of the evidence against the petitioner." 477 U.S. at 181-82.  Moreover, state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly*, 416 U.S. at 645; *see Slagle v. Bagley*, 457 F.3d at 501, 516 (6th Cir. 2006).

On cross-examination, defense counsel challenged the qualifications and investigative techniques of Detective Samuel Howe, who had examined and photographed

evidence at the crime scene.  Counsel asked questions highlighting the discrepancy between the methods used by Detective Howe and those recommended by the FBI, asking whether Detective Howe agreed that the FBI was the "authoritative source of how to collect evidence."  RT 6/3/92, Vol. I, at 61.  During his redirect examination, the prosecutor asked whether Detective Howe was aware of a "standing joke" among FBI instructors at the seminars he had attended.  *Id.* at 72.  Detective Howe replied in the affirmative and elaborated that the joke was that "Anything that can be done wrong, the FBI will do it first." *Id.*  The trial court sustained defense counsel's objection on relevance grounds and told the jury to "disregard that."  *Id.* at 73.  Particularly when viewed in the context of the questions posed on cross-examination, which vigorously challenged the competence of the investigators and the quality of their investigation, this exchange between the prosecutor and the detective was innocuous and could have had no effect on the fairness of the trial. Moreover, the court instructed the jury to disregard the comments, and it is presumed that the jury will follow such an instruction and disregard inadmissible evidence inadvertently presented to it.  *Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987).

During his closing arguments, the prosecutor referred to the .25 caliber shell that was found in the victims' house and that was matched to the weapon that Petitioner tossed away when apprehended.  RT 6/11/92 at 68-69.  He argued that evidence showing that several guns were used, including the .25 caliber pistol, supported a finding that both Murray brothers "were firing guns in that house, not just one."  *Id.* at 86.  These comments did not constitute prosecutorial  misconduct.  During closing argument the prosecutor has wide latitude to argue reasonable inferences based on the evidence.  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  The inference drawn by the prosecutor – that the use of multiple weapons indicated that more than one person was firing weapons – was reasonable. The prosecutor did not, as Petitioner suggests, argue that the .25 caliber pistol was used to shoot the victims, and Petitioner's counsel emphasized during his closing argument that neither victim had been shot by the gun.  RT 6/11/92, Vol. II, at 29-30.

1    Petitioner contends that the prosecutor committed misconduct during his closing

2    argument by referring to the Murrays as the "boys from Alabama" (RT 6/11/92, Vol. I, at

3    68, 92), which, according to Petitioner, improperly emphasized the fact that the victims were

4    local while the defendants hailed "from a backwoods state with a frightening history of

5    violence." Dkt. 40 at 73-74.  The Court concludes that the prosecutor's use of this rhetorical

6    device did not carry the connotations Petitioner ascribes to it and did not deprive him of a

7    fair trial.

8    Finally, Petitioner contends that the prosecutor committed misconduct by suggesting

9    during his closing argument that the defendants experienced a "sick excitement" and "some

10   sick crazy high" as they carried out the crimes.  RT 6/11/92, Vol. I, at 78.  Defense counsel

11   objected to this commentary and the prosecutor did not repeat this language after a side bar

12   with the trial judge.  *See id.* at 79.  The comments were made as the prosecutor attempted

13   to explain the defendants' frenetic actions on the night of the murders.  *Id.* at 78.  Although

14   the comments certainly could be viewed as inflammatory, they occurred on only one

15   occasion during closing arguments, were immediately interrupted by an objection and side

16   bar, and were not repeated.  The Court concludes that they did not "so infect[] the trial with

17   unfairness as to make the resulting conviction a denial of due process" as required for

18   habeas relief under Darden.  477 U.S. at 181.  The remarks "did not manipulate or misstate

19   the evidence, nor did [they] implicate other specific rights of the accused such as the right

20   to counsel or the right to remain silent."  *Id.* at 182.  The comments were also significantly

21   less egregious than the statements in *Darden*, which were condemned by every reviewing

22   court but found not to violate due process.[15]  *Id.* at 179.  In addition, any potential prejudice

23   resulting from the comments was ameliorated by the trial court's instruction, following

24   closing arguments, that the jury was not to be "influenced by sympathy or prejudice" and

25

26   [15] In *Darden*, the prosecutor called the defendant an "animal," stated, "I wish I could
     see [the defendant] sitting here with no face, blown away by a shotgun," and told the jury that
27   imposing the death penalty was the only way to protect society from future crimes.  477 U.S.
     at 180.

28

that "what the lawyers said is not evidence." RT 6/12/92 at 29.  Finally, the weight of the evidence against Petitioner was overwhelming.  *Darden*, 477 U.S. at 182; *see Cook v. Schriro*, 516 F.3d 802, 822-23 (9th Cir. 2008) (petitioner not entitled to relief where it was clear that the jury would have returned a guilty verdict notwithstanding the prosecutor's comments).

The Arizona Supreme Court did not unreasonably apply clearly established federal law in denying Petitioner's prosecutorial misconduct claims.   Therefore, Petitioner is not entitled to relief on Claim 12.

**I.**     **Claim 13**

Petitioner alleges that his constitutional rights were violated when the trial court denied his motion for a mistrial based on references to his custody status.  Dkt. 40 at 76-78; *see* Dkt. 56 at 23-24.

1.     Background

Petitioner and Robert Murray objected and moved for a mistrial after a detective testified that blood was drawn from each defendant by a "nurse in jail."  RT 6/3/92, Vol. I, at 25.  The trial court denied the motion, finding that the defendants were not prejudiced, but sustained the objection to the testimony and struck the detective's answer.  *Id.* at 27-28. Later, another officer testified that the defendants' clothing was taken while they were in jail following the high-speed chase.  RT 6/4/92, Vol. II, at 12, 15.  The defense did not object to this testimony.

The Arizona Supreme Court rejected the claim that the testimony was prejudicial and warranted a mistrial:

> The trial court has broad discretion in ruling on a motion for mistrial, and failure to grant the motion is error only if it was a clear abuse of discretion.  *State v. Stuard,* 176 Ariz. 589, 601, 863 P.2d 881, 893 (1993). In deciding whether a mistrial is required due to witness comments, the trial court must consider whether the comments caused jurors to consider improper matters and the probability that the jurors were influenced by such comments. *Id.*
>
> . . . "A declaration of a mistrial is the most dramatic remedy for trial error and

1

2

3

4

5

> should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson,* 136 Ariz. 250, 262, 665 P.2d 972, 984, *cert. denied,* 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). The trial court's decision will be reversed only if it's "palpably improper and clearly injurious." *State v. Walton,* 159 Ariz. 571, 581, 769 P.2d 1017, 1027 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Certainly the jurors were aware that defendants were arrested and had spent some time in custody prior to trial. Such knowledge is not prejudicial and does not deny defendants the presumption of innocence.

6

*Murray*, 184 Ariz. at 34-35, 906 P.2d at 567-68.

7

2.   Analysis

8

9

10

11

12

13

14

15

Petitioner contends that the trial references to his custody status "unbearably strained the presumption that [he] was innocent." Dkt. 40 at 77. But he cites no clearly established federal law, in the form of Supreme Court precedent, for the proposition that the mere mention that a defendant is in custody constitutes a due process violation. *See Carey v. Musladin*, 127 S. Ct. 649, 653-54 (2006). Instead, Petitioner relies on *Estelle v. Williams*, 424 U.S. 501, 503-04, 512 (1976), which holds that a state may not compel a defendant to stand trial before a jury while dressed in identifiable prison clothes; doing so violates the defendant's fair trial rights, particularly his right to be presumed innocent.

16

17

18

19

20

21

22

23

24

25

26

27

In addressing claims like Petitioner's, courts have explained that "[t]he rule of *Estelle* does not apply, however, to every 'mere utterance of the words [jail, prison, or arrest],' without reference to context or circumstances." *United States v. Atencio*, 435 F.3d 1222, 1237 (10th Cir. 2006) (quoting *United States v. Villabona-Garnica,* 63 F.3d 1051, 1058 (11th Cir. 1995)); *see United States v. Washington*, 462 F.3d 1124, 1136-37 (9th Cir. 2006); *United States v. Faulk*, 53 F. App'x. 644, 647 (3d Cir. 2002). In *Washington*, for example, the Ninth Circuit held that informing a jury that a defendant is incarcerated while awaiting trial may undermine the presumption of innocence. 462 F.3d at 1136-37. The court explained, however, that "the impact of referring to a defendant's incarceration is not constant as it is with prison garb." *Id.* at 1137. The court further noted that "although no state purpose is served by requiring defendants to wear prison garb in front of a jury," references to incarceration may serve a legitimate purpose where they constitute relevant

28

information.  *Id.*

When viewed in context, the witnesses' brief comments did not undermine the presumption of innocence.  The testimony was elicited while the prosecutor was attempting to establish foundation for items of evidence taken from the defendants; the testimony referred to the fact that the Murrays had been taken into custody after being apprehended following the car chase.  *See Atencio*, 435 F.3d at 1237 (distinguishing references to "ordinary pretrial detention" from more prejudicial references to prior convictions or continuing detention).  Any potential prejudice was ameliorated by the fact that the references to Petitioner's original detention were related to other testimony concerning the circumstances of the Murrays' flight and arrest and the collection of evidence, subjects that were significant not only to the State but also to the defense theory that officers rushed to judgment and bungled the investigation.  *See Washington*, 462 F.3d at 1137 (distinguishing relevant from irrelevant references to incarceration).  Finally, the comments were isolated and did not serve as a "constant reminder" to the jury of Petitioner's condition to the detriment of the presumption of his innocence.

Petitioner is not entitled to relief on Claim 13.

**J.      Claim 14**

Petitioner alleges that his rights were violated by the trial court's denial of his motion for acquittal on the armed robbery and felony murder charges.  Dkt. 40 at 78-79; *see* Dkt. 56 at 24-25.  Petitioner challenges the sufficiency of the evidence supporting his convictions for armed robbery and felony murder.  *Id.*  Specifically, he attacks the credibility of Detective Lent, cites potentially exculpatory evidence involving other possible suspects, and notes gaps in the evidence against him, including the fact that no fingerprints linked the Murrays to the crime scene.  *Id.*

1.      Background

On direct appeal, Petitioner argued that the State failed to prove the elements of armed robbery, which was the predicate offense for the felony murder charge.  Opening Br.

at 37-41.  Specifically, Petitioner contended that there was no showing that he used force in the course of taking property.  *Id.*  The Arizona Supreme Court held that the convictions were supported by the evidence at trial:

> A person commits armed robbery if in the course of taking property from the presence of another against his will, such person is armed with a deadly weapon and threatens or uses force with the intent to coerce the surrender of property or to prevent resistance.  A.R.S. §§ 13-1902, -1904 (1989).  "[T]here must be evidence establishing that defendant's intent to commit robbery was coexistent with his use of force."  *Lopez,* 158 Ariz. at 263, 762 P.2d at 550 (quoting *State v. Wallace,* 151 Ariz. 362, 365, 728 P.2d 232, 235 (1986), *cert. denied,*483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987)).  We also have stated that "a robbery may also be established when the use of force precedes the actual taking of property, so long as the use of force is accompanied with the intent to take another's property."  *State v. Comer,* 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990), *cert. denied,*499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991).

> Here, there is evidence that the Murray brothers took property from the store, which was not open for business.  Further, there is evidence that they took the property from Morrison's immediate presence, as Morrison's flashlight, keys, and glasses were found on the porch and signs of a struggle were found in the courtyard.  Loose coins were disbursed throughout the courtyard, suggesting that the defendants already had taken some property when they subdued Morrison.  *See id.*  ("[T]he only reasonable inference based on the evidence was that appellant shot [the victim] in furtherance of his previously formulated plan to obtain money and supplies.").  Clearly, they were armed, as they were arrested a few hours later with the same weapons as those used on the victims.  Thus, this case differs from *Lopez,* where there was no evidence that force was used in the course of taking property.

> Roger also claims there is no evidence that he "killed, attempted to kill or intended to kill";  therefore, the felony murder conviction is invalid.  But the state need not prove that defendant "killed, attempted to kill, or intended to kill" in order to prove felony murder.  *See* A.R.S. 13-1105(A)(2) (Supp.1994).  The state need only prove that defendant, either as a principal or as an accomplice, committed or attempted to commit robbery and that someone was killed in the course of and in furtherance of the robbery.  *Id.*; A.R.S. § 13-303(A) (1989) (criminal liability based upon conduct of another); *see State v. Collins,* 111 Ariz. 303, 307, 528 P.2d 829, 833 (1974) (defendant could be convicted and sentenced for first degree murder and armed robbery, even though defendant did not actually shoot victim).

*Murray*, 184 Ariz. at 31-32, 906 P.2d at 564-65.

### 2.   Analysis

In reviewing a claim of insufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reaching its determination as to the sufficiency of the evidence this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of witnesses. *Herrera v. Collins*, 506 U.S. 390, 401-402 (1993); *Jackson v. Virginia*, 443 U.S. at 319 n.13. Moreover, a state court's construction of its own statute is binding on this court. *Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law"). As the Second Circuit explained, "[t]hese factors combine to suggest that AEDPA deference may well be at its highest when a habeas challenges a state court's determination that the record evidence was sufficient to satisfy the state's own definition of a state law crime." *Policano v. Herbert*, 453 F.3d 79, 92 (2d Cir. 2006).

Taking into account the evidence discussed by the state supreme court, it is plain that a rational factfinder could have determined that all of the elements of armed robbery had been proved, and, furthermore, that the killings were committed in the course and in furtherance of the robberies. The evidence, viewed in the light most favorable to the State, showed that the Murrays were armed with several weapons; that they took the victims' property after ransacking their home; and that they used force, struggling with Morrison at one point before shooting both victims in the back of the head as they lay on the floor. From these circumstances, a reasonable factfinder could determine that the Murrays' intent to take the victims' property was accompanied by or co-existent with their use of force.

Petitioner is not entitled to relief on Claim 14.

**K.      Claim 15**

Petitioner alleges that his rights were violated by the trial court's failure to provide a jury instruction regarding the State's failure to preserve evidence. Dkt. 40 at 79-83; *see* Dkt. 56 at 25-26.

1.      Background

At the close of trial, the defendants requested that the court provide a so-called

1   "*Willits*" instruction,[16] citing, among other alleged deficiencies, the State's failure to test

2   items of clothing for gunshot residue; preserve evidence, including a fast food bag, found

3   in the defendants' vehicle; establish the victims' time of death; analyze unidentified

4   fingerprints on guns found in the victims' residence; collect trace evidence; photograph all

5   of the footprints; and pursue various investigative leads. *See* ROA 160; RT 6/11/92, Vol.

6   I, at 36-42, 52-56. The trial court denied the request, finding that the defendants had failed

7   to make the required showing that the lost or destroyed evidence had a tendency to

8   exonerate the defendants. *Id.* at 56-58.

9        On direct appeal, the Arizona Supreme Court rejected Petitioner's challenge to the

10  trial court's ruling:

11       "A *Willits* instruction is appropriate when the state destroys or loses evidence
         potentially helpful to the defendant." *State v. Lopez,* 163 Ariz. 108, 113, 786

12       P.2d 959, 964 (1990). A trial court's decision to grant or deny a requested
         *Willits* jury instruction is judged on an abuse of discretion standard. *Henry,*

13       176 Ariz. at 583, 863 P.2d at 875.

14                              . . . .

15       Destruction or nonretention of evidence does not automatically entitle
         a defendant to a *Willits* instruction. Defendant must show (1) that the state

16       failed to preserve material and reasonably accessible evidence having a
         tendency to exonerate him, and (2) that this failure resulted in prejudice.

17       *Henry,* 176 Ariz. at 583, 863 P.2d at 875.

18       Roger's *Willits* instruction was properly denied because none of the
         allegedly unavailable evidence tended to exonerate him. *See State v.*

19       *Broughton,* 156 Ariz. 394, 399, 752 P.2d 483, 488 (1988). Contrary to
         Roger's contentions, the time of death was estimated as between 6:15 p.m.

20       and 9:00 a.m.; the bathrobes and flashlight indicate that the crimes occurred
         while it was dark. The Burger King bag was not preserved because one of the
         detectives determined it had no evidentiary value-there was no receipt or

21       indication of location of purchase in the bag. The footwear of others at the
         scene also was determined to have no evidentiary value. *See State v. Day,*

22       148 Ariz. 490, 497, 715 P.2d 743, 750 (1986). Detective Lent noted the
         footprints attributable to those at the scene, thus photographing or otherwise

23       recording their shoes was not necessary for later comparison. What was
         preserved were the suspects' footprints. A *Willits* instruction is not given

24       merely because a more exhaustive investigation could have been made. *State*

25

26       [16] Under *State v. Willits,* 96 Ariz. 184, 187, 191, 393 P.2d 274, 276, 279 (1964), when

27  the state destroys material evidence, the jury may infer that the facts are against the state's

    interest.

28
                                      - 48 -

*v. Willcoxson,* 156 Ariz. 343, 346, 751 P.2d 1385, 1388 (App.1987).  The court did not abuse its discretion in not giving a *Willits* instruction.

*Murray*, 184 Ariz. at 33, 906 P.2d at 566.

### 2.  Analysis

 A habeas court's review of a failure to give a jury instruction is limited to a determination of whether the failure so infected the entire trial that the defendant was deprived of his right to a fair trial.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  Because the omission of an instruction is less likely to be prejudicial than a misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "especially heavy" burden.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  It is clear that the failure to provide a *Willits* instruction did not violate Petitioner's right to a fair trial.

The Due Process Clause of the Fourteenth Amendment imposes a duty on the state to preserve evidence that "might be expected to play a significant role in the suspect's defense."  *California v. Trombetta*, 467 U.S. 479, 488 (1984).  Under the *Trombetta* standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id.* at 489.  To establish a due process violation when the government fails to preserve evidence that is only potentially exculpatory, the petitioner must demonstrate that the government acted in bad faith.  *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

Petitioner's principal contention is that his alibi defense was compromised by the State's failure to retain certain items of evidence and perform certain tests.  It is clear, however, that none of the evidence at issue meets the *Trombetta* standard of possessing an "exculpatory value that was apparent before it was destroyed."  467 U.S. at 489.  Because such evidence clearly falls into the "potentially useful" category, the *Youngblood* standard applies, and Petitioner must "show bad faith on the part of the police."  *Youngblood*, 488 U.S. at 58; *see Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (failure to preserve

evidence of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant, is not a denial of due process unless a criminal defendant can show bad faith).

While Petitioner criticizes the quality of the investigation, he does not allege that the police acted in bad faith in failing to preserve or analyze evidence. Petitioner's characterization, if accurate, may show negligence on the part on the investigators, but it does not establish bad faith. *Youngblood*, 488 U.S. at 58; *see Villafuerte v. Stewart*, 111 F.3d 616, 625-26 (9th Cir. 1997) (per curiam) (officers' failure to test for fingerprints in certain areas and failure to perform tests on semen samples did not demonstrate bad faith). Petitioner has not shown, or even alleged, that the police acted with "animus" or engaged in "a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488; *see Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989).

At trial, the defendants cross-examined the State's witnesses on the purported inadequacies of the investigation. These witnesses explained their actions, none of which could be construed as indicative of bad faith. For example, the Burger King bag was examined and discarded because it did not contain a receipt or other identifying information. RT 6/4/92, Vol. II, at 33-34. While the medical examiner made no attempt to determine the time of death, he testified that he did not do so because "[t]here was so much other evidence that I didn't feel like it was necessary because time of death is – is always subject to variation" and "[y]ou've always got a range of a couple of hours." RT 6/3/92, Vol. II, at 13-14. Although Petitioner asserts that tests were available that would have enabled a more precise estimate of the time of death, the police do not have a "constitutional duty to perform all tests desired" by a suspect. *Villafuerte*, 111 F.3d at 625 (citing *Youngblood*, 488 U.S. at 59).

In sum, Petitioner has failed to make any showing that the officers conducting the investigation acted in bad faith when they failed to perform certain tests, gather additional evidence, or preserve various items. *See Gausvick v. Perez*, 345 F.3d 813, 817 (9th Cir.

2003) (to demonstrate bad faith defendant must "put forward specific, nonconclusory allegations that establish improper motive").  Similarly, Petitioner has not shown that the State destroyed material evidence such that a *Willits* instruction was required under Arizona law.  Because Petitioner cannot show that the trial court's failure to provide a *Willits* instruction rendered his trial unfair, he is not entitled to relief on Claim 15.

**L.   Claim 16**

Petitioner alleges that his rights were violated by the trial court's refusal to provide a jury instruction with respect to intoxication.  Dkt. 40 at 83-84; *see* Dkt. 56 at 26-27.

1.   Background

At the close of the testimony, trial counsel for both defendants requested an instruction on voluntary intoxication.  RT 6/10/92, Vol. II, at 112-13.  The trial court denied the request, stating, "I don't see that you have made out any credible evidence on intoxication.  The fact that the defendants were drinking isn't – there's no testimony as to what effect that had on their ability to think or their abilities to function or to form the intent involved, and I will not give an instruction on intoxication."  *Id*. at 114.  On direct appeal, the Arizona Supreme Court rejected Petitioner's challenge to this ruling:

> Roger argues that he was entitled to a voluntary intoxication instruction because intent is a necessary element of the crimes charged.  *See* A.R.S. § 13-503 (amended 1993).  Defendants had visited the Temple Bar on May 13, fifty-three miles from the crime scene.  A manager at the Temple Bar testified that the two men were "handling themselves very well."  The trial court found that the evidence presented did not show that the alcohol had an effect on their ability to think, function, or form intent.  *See LaGrand,* 152 Ariz. at 487, 733 P.2d at 1070; *State v. Edgin,* 110 Ariz. 416, 418, 520 P.2d 288, 290 (1974); *State v. Gonzales,* 123 Ariz. 11, 12-13, 596 P.2d 1183, 1184-85 (App.1979).
>
> "An intoxication instruction should be given only when the record supports such an instruction."  *LaGrand,* 152 Ariz. at 487, 733 P.2d at 1070.  Mere proof of consumption of alcohol is insufficient for an instruction; there must be evidence that alcohol could have had an effect on defendant so as to negate an element of the crime.  *See, e.g., Edgin,* 110 Ariz. at 418, 520 P.2d at 290.  Defendant failed to meet this burden.

*Murray*, 184 Ariz. at 33-34, 906 P.2d at 566-67.

1
2.    Analysis

2
As previously noted, the Court must determine whether the failure to provide a

3
particular jury instruction deprived Petitioner of a fair trial. *Dunckhurst*, 859 F.2d at 114.

4
Petitioner cannot make such a showing.  As the trial court and Arizona Supreme Court

5
found, the testimony showed that the Murrays were drinking at a bar prior to the murders,

6
but there was no evidence that they were intoxicated.  Under 28 U.S.C. § 2254(e)(1), that

7
finding is presumed to be correct, and Petitioner has not overcome the presumption with

8
clear and convincing evidence.  In fact, the evidence at trial was to the contrary.  The

9
witness upon whom Petitioner relied for his claim that he was intoxicated testified only that

10
the Murrays were sitting at the bar drinking when he arrived between 5:00 and 6:00 p.m. and

11
were still there when he left between 9:00 and 10:00 p.m..  RT 6/9/92, Vol. I, at 13-14, 17-

12
18.  When asked if they "appear[ed] to be intoxicated or drugged up?" the witness replied,

13
"No.  They were handling themselves very well." *Id.* at 17.

14
Petitioner's right to a fair trial was not denied by the failure to provide an instruction

15
that was not supported by the evidence. *See Spears v. Mullin*, 343 F.3d 1215, 1244-45 (10th

16
Cir. 2003) (failure to provide voluntary intoxication instruction did not render trial

17
fundamentally unfair where evidence showed only that petitioner had consumed alcohol but

18
did not establish impairment).  Claim 16 is denied.

19
**M.    Claim 17**

20
Petitioner alleges that his rights were violated by the trial court's failure to provide

21
a jury instruction on second degree murder as a lesser included offense.  Dkt. 40 at 84-86;

22
*see* Dkt. 56 at 27.

23
1.    Background

24
The trial court denied the defendants' request for a second degree murder instruction

25
on the grounds that it was not supported by the evidence and the defense theory was that

26
someone else had committed the murders.  RT 6/10/92, Vol. II, at 112.  On direct appeal,

27
the Arizona Supreme Court also found that Petitioner was not entitled to the instruction:

28

Roger wanted a second degree murder instruction.  Such an instruction would be applicable, if at all, only to the premeditated murder count, since there are no lesser included offenses of felony murder of which defendant was, in any event, convicted.  *State v. LaGrand,* 153 Ariz. 21, 30, 734 P.2d 563, 572, *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987).  As a general rule, however, defendant is entitled to instructions on lesser included offenses if they are supported by the evidence.  *Beck v. Alabama,* 447 U.S. 625, 627, 100 S.Ct. 2382, 2384, 65 L.Ed.2d 392 (1980); *Clabourne,* 142 Ariz. at 345, 690 P.2d at 64.  This is particularly so in a capital case.  *See State v. Krone,* 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995).

Premeditated murder occurs if the defendant intends or knows that his acts will kill another and his intention or knowledge precedes the killing by a length of time sufficient to permit reflection.  *Lopez,* 163 Ariz. at 112, 786 P.2d at 963.  For a second degree murder charge, the evidence must show a lack of premeditation and deliberation.  *Clabourne,* 142 Ariz. at 345, 690 P.2d at 64.  "To determine whether there is sufficient evidence to require the giving of a lesser included offense instruction, the test is whether the jury could rationally fail to find the distinguishing element of the greater offense."  *Krone,* 182 Ariz. at 323, 897 P.2d at 625 (internal quotation omitted) (quoting *State v. Detrich,* 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994)).  Thus, we must determine whether the jury could have rationally failed to find premeditation.

In denying the instruction, the trial court stated, "[B]ased on the physical evidence, I don't see how it can be anything other than first degree murder."  We agree.  "The evidence produced at trial . . . did not indicate the deaths were caused by intentional, knowing, or reckless conduct, without premeditation, as prescribed by A.R.S. § 13-1104 (second degree murder)."  *State v. Lamb,* 142 Ariz. 463, 472, 690 P.2d 764, 773 (1984).  Defendants had the victims lie on the carpet of their living room and proceeded to shoot each of them with different weapons in the back of the head.  The only inference that a jury rationally could have drawn was that defendants premeditated.  *See Salazar,* 173 Ariz. at 408, 844 P.2d at 575 ("Because defendant's theory of the case denies all involvement in the killing, and no evidence provides a basis for a second degree murder conviction, the instruction was properly refused.").

*Murray*, 184 Ariz. at 34, 906 P.2d at 567.

2.   Analysis

Due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction.  *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980).  A lesser included offense instruction is warranted if "there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense."  *Hopper*, 456 U.S. at 610.  The Ninth Circuit has "interpreted *Beck* and *Hopper* not to require a second-degree murder instruction where evidence of

premeditation is overwhelming and the petitioner's defenses are not directed at negating premeditation." *Cook*, 516 F.3d at 825. Both of these factors are present here.

Under Arizona law, a defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13-1101(1). At trial, no evidence was presented that would have allowed a jury rationally to convict Petitioner of second degree murder while acquitting him of first degree murder. As the trial court and Arizona Supreme Court noted, the evidence that the victims were shot execution-style as they lay together on the floor precluded a rational juror from finding that Petitioner committed the murders without premeditation or because of a sudden quarrel or heat of passion. *See Cook*, 516 F.3d at 825; *Clabourne v. Lewis*, 64 F.3d 1371, 1381 (9th Cir. 1995); *Carriger v. Lewis*, 971 F.2d 329, 335-336 (9th Cir. 1992). In addition, Petitioner's defense was not that he killed the victims without premeditation, but that he was not present when they were shot. Petitioner claimed that he and his brother came upon the victims' possessions at some point after they were killed. *See, e.g.*, Dkt 91 at 14. Under these circumstances, Petitioner was not entitled to a second degree murder instruction.[17] *See Cook*, 516 F.3d at 825. Claim 17 will be denied.

**N. Claim 18**

Petitioner contends that Arizona's felony murder statute violates due process and equal protection because it does not permit an instruction on second degree murder as a lesser included offense. Dkt. 40 at 86-87; *see* Dkt. 56 at 27-28. The Arizona Supreme Court rejected the due process aspect of this claim. *Murray*, 184 Ariz. at 34, 906 P.2d at 567.

There is no clearly established federal law holding that a felony murder statute must

---

[17] In any event, Petitioner was not prejudiced by the absence of a second degree murder instruction because the jury also unanimously found him guilty of felony murder.

contain lesser included offenses. To the contrary, in *Hopkins v. Reeves*, 524 U.S. 88, 96-97 (1998), the Supreme Court held that Nebraska was not constitutionally required to give an instruction on the non-capital charge of second degree murder when the defendant was charged with the capital charge of felony murder because, under Nebraska law, second degree murder was not a lesser included offense of felony murder. Petitioner is not entitled to relief on Claim 18. *See Musladin*, 127 S. Ct. at 654.

### O.   Claim 19

Petitioner alleges that his federal constitutional rights were violated because a judge, rather than a jury, determined his sentence. Dkt. 40 at 87-88. Relief on this claim is foreclosed by *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), in which the Supreme Court announced that the holding in *Ring v. Arizona*, 537 U.S. 284 (2002) (requiring jury sentencing), is not retroactive.

### P.   Claim 22

Petitioner asserts that the application of the multiple homicides aggravating factor, A.R.S. § 13-703(F)(8), constitutes double jeopardy. Dkt. 40 at 93; *see* Dkt. 56 at 28-29. The Arizona Supreme Court rejected this claim. *Murray*, 184 Ariz. at 38, 906 P.2d at 571.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Supreme Court has explained that the clause consists of several protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *United States v. DiFrancesco,* 449 U.S. 117, 129 (1980) (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969)). None of these protections are implicated by the application of the (F)(8) aggravating factor to each of Petitioner's murder convictions.

Petitioner is not being punished twice for the same crime. His sentences were based on the murders of two different victims; there are two convictions and two sentences.

Aggravating circumstances, such as that set forth in (F)(8), only determine whether the crime of murder will carry the death penalty.  As the Supreme Court has explained, "[a]ggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between alternative verdicts of death and life imprisonment."  *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981); *see Lowenfield v. Phelps*, 484 U.S. 231, 244-46 (1988); *Green v. Zant*, 738 F.2d 1529, 1541 (11th Cir. 1984) (statutory aggravating circumstances are not offenses for double-jeopardy purposes, but rather are procedural standards designed to control a jury's discretion in capital cases in order to ensure against capricious and arbitrary enforcement of the death penalty).  There is no Supreme Court precedent rejecting the use of multiple homicides as an aggravating factor, on double-jeopardy or any other grounds.

The Arizona Supreme Court's ruling denying Petitioner's challenge to the (F)(8) aggravating factor was neither contrary to, nor an unreasonable application of, clearly established federal law.  *See Musladin*, 127 S. Ct. at 654.  Petitioner is not entitled to relief on Claim 22.

**Q.    Claim 38**

Petitioner alleges that his constitutional rights were violated by the trial court's ruling denying him access to the law library. Dkt. 40 at 132-33; *see* Dkt. 56 at 35-37. The Arizona Supreme Court rejected this claim, relying on *Bounds v. Smith,* 430 U.S. 817 (1977). *Murray*, 184 Ariz. at 28, 906 P.2d at 561.

In *Bounds*, the Supreme Court held that the constitutional right of access to the courts requires the state to provide "adequate law libraries *or* adequate assistance from persons trained in the law." 430 U.S. at 828 (emphasis added).  In denying Petitioner's claim, the Arizona Supreme Court explained that "[b]ecause defendants were provided with either advisory counsel or counsel throughout their proceedings, their constitutional right to court access was met, regardless of whether they had personal access to legal materials." *Murray*,

184 Ariz. at 28, 906 P.2d at 561.  This decision is not an unreasonable application of *Bounds*.  Appointment of counsel can be a valid means of fully satisfying a state's constitutional obligation to provide prisoners, including pretrial detainees, with access to the courts as required by *Bounds*.  *See Bourdon v. Loughren*, 386 F.3d 88, 93-94 (2d Cir. 2004) (collecting cases).  Petitioner is not entitled to habeas relief on Claim 38.

**R.    Claim 45**

Petitioner alleges that he received ineffective assistance because lead counsel fell asleep on several occasions during the trial.  Dkt. 40 at 152-53; *see* Dkt. 56 at 48-50.

1.    Background

Petitioner raised this claim in his PCR petition.  PCR pet. filed 3/5/99 at 10-12.  The PCR court granted an evidentiary hearing, which was held on January 22 and 23, 2000.[18]

At the hearing, Petitioner testified that Dickey fell asleep almost every day of the trial, sometimes drooling or snoring, and that he had to kick or nudge Dickey to wake him. RT 1/22/00 at 129, 132.  According to Petitioner, Dickey fell asleep during the prosecutor's opening statement and during the direct examination of witnesses for the State, including the testimony of Detective Lent, when Dickey slept for four or five minutes, and Dr. Schieve, when he fell asleep several times for a minute or two, and during the testimony of

_____

[18] In granting the hearing on this claim, the court made the following observations:

Well, I guess – I guess I have to tell you I remember some things about this trial very well.  And one was that Mr. Dickey was very aggressive, very emphatic and – but of course you know – and I – I never saw him asleep.  But, you know, I guess I'll let you have an opportunity to show me that he was sleeping during substantial portions of the trial because we have Affidavits that say he was.  But I have to tell you, I'm skeptical about that because I remember how aggressive he was – aggressively he argued when we were off the record, the objections in the case.

So I guess I'll set that – that one I think probably should be set for an evidentiary hearing because, you know, it's – it's certainly not something that was on the record and certainly not something that I noticed.

RT 1/10/00 at 27-28.

defense expert Jack Nelson. *Id.* at 130, 133-37. Petitioner also testified that he brought his concerns about Dickey to the attention of co-counsel Gerald Gavin. *Id.* at 137-38. According to Petitioner, he also complained directly to Dickey, who explained that he had a medical condition that caused him to fall asleep. *Id.* at 138-39. Ms. O'Neill, co-defendant's counsel, testified that Dickey appeared to be asleep, with his eyes shut and his head down, at several moments during the trial. *Id.* at 32-35. A juror from Petitioner's trial testified that she "vaguely remember[ed] [Dickey] like nodding off, but it's so vague. And I'm not sure if I remember it at the actual trial or because I was reminded of it shortly after that." *Id.* at 69. She believed she had a recollection of Dickey with his eyes closed and his head bobbing as though he had been awakened. *Id.* at 75. She also testified, however, that if she had seen Dickey asleep for a significant period she would have informed someone. *Id.* at 81. Carla Ryan, Petitioner's appellate counsel, recalled that Petitioner had complained to her that Dickey had slept during his trial. *Id.* at 96.

Dickey testified at the evidentiary hearing. He indicated that Petitioner had complained to him about his falling asleep while visiting Petitioner in jail. *Id.* at 111. He had no memory of Petitioner complaining that he had fallen asleep in court and he did not think he had done so, but he conceded it was possible he took a cat nap for a few seconds. *Id.* at 111, 117. He testified that he could not dispute Ms. O'Neill's reported observations of him apparently dozing during trial. *Id.* at 113. Dickey acknowledged that he had a habit of closing his eyes and folding his arms when witnesses were being examined. *Id.* at 115.

The prosecutor, the bailiff, the detective who sat at the prosecution table, and Dickey's co-counsel, Gerald Gavin, all testified that they did not observe Dickey sleeping nor any signs that he had been sleeping during the trial. *Id.* at 191-92; RT 1/23/00 at 9, 29, 48-49. Similarly, all four of these witnesses, including the investigator who reported being particularly observant because of the security threat posed by the defendants, stated that they did not witness Petitioner nudge or kick Dickey. RT 1/22/00 at 195-96; RT 1/23/00 at 9, 30, 55-58. The prosecutor recalled that Dickey was a very active participant throughout the

proceedings (RT 1/22/00 at 192-93), as did the detective who remembered being subjected to a thorough cross-examination (RT 1/23/00 at 30-31).   Gavin characterized Dickey's performance at Petitioner's trial as "excellent" and "very engaged," and recalled that Dickey's frequent objections were appropriate and did not suggest that Dickey had failed to follow the direct examination.  *Id.* at 51-52.  None of these witnesses received a report that Dickey was sleeping during the trial, and both the prosecutor and Gavin testified that if they had been aware that Dickey was sleeping they would have spoken to him and the judge about it.  RT 1/22/00 at 196-97; RT 1/23/00 at 53-54.  Gavin specifically denied that Petitioner had informed him that Dickey had been sleeping during trial.  RT 1/23/00 at 56, 76.   Gavin noted that Dickey had a habit of rubbing his eyes and that some of his movements were jerky due to his arthritis (*id.* at 49), and the prosecutor testified that he was familiar with Dickey's habit of cocking his head and closing his eyes while listening to other people speak (RT 1/22/00 at 194-95).

After the hearing, the PCR court summarized the testimony, made factual findings, and denied the claim:

> During the hearing, petitioner alleged that Frank Dickey, lead defense counsel fell asleep at trial and therefore deprived petitioner of his right to counsel. Petitioner testified that he kicked Mr. Dickey numerous times during the trial to try to keep him awake. Specifically, Roger Murray claims that his attorney slept during extensive portions of the testimony of [Detective] Dale Lent, Dr. Schieve [the medical examiner] and defense witness Jack Nelson.  Roger Murray claims that when Frank Dickey slept he snored and drooled.  He also testified that during trial breaks he talked to Frank Dickey and co-counsel Jerry Gavin about the fact that Frank was sleeping.  He asserts that at least one conversation occurred in the presence of Ruth O'Neill and Robert Murray . . .
>
> Ms. O'Neill corroborates Roger Murray's claim to a certain extent. She testified that Mr. Dickey has a habit of listening to testimony with his hands together at his chin and his eyes closed.  She believes she saw him with a startled look "a couple of times" and concluded that he was sleeping.  She does not remember discussing this allegation with Roger Murray or counsel during the trial.
>
> A juror, Ann Theobald, testified that she remembers something about Mr. Dickey nodding off during the trial.  The Court discounts her testimony because she seemed to accept whatever proposition was presented to her by counsel.  She agreed with inconsistent characterizations [sic] presented by both the State and the petitioner during questioning.  Additionally, her memory

may have been tainted by conversations she had with an unknown investigator or reporter.

The petitioners [sic] claim is refuted however by the other witnesses and the transcript of the trial. Transcripts of the testimony of Jack Nelson, Dr. Schieve and Dale Lent shows [sic] Frank Dickey was actively engaged in the trial. Jace Zack [the prosecutor], Robert Johnson [the bailiff] and Detective Ingrassi never saw Mr. Dickey sleeping even though they were all within a few feet of Mr. Dickey during the trial.

Gerald Gavin, co-counsel for Roger Murray refutes the petitioners [sic] claims. Even though Roger Murray sat between counsel during the trial, Mr. Gavin never saw Roger Murray kick or nudge Frank Dickey. Mr. Gavin testified that Frank did not sleep, was very engaged in the trial and Roger Murray never complained to him during the trial.

Frank Dickey admits that "anything is possible," but claims he was active and engaged during the trial. Furthermore, he was fully prepared and listening to the testimony at trial. When specifically asked if he slept during the trial, he said "as far as I know I was awake" and "I don't today have any sensation of having awoken during trial."

He also claimed that Roger Murray never complained to him about sleeping.

The Court therefore finds that petitioner has failed to carry the burden of proof on this issue. The Court specifically finds that Frank Dickey did not sleep during the trial.

ME 3/21/02. As explained below, this decision does not entitle Petitioner to habeas relief because it does not represent an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2).

2.     Analysis

Courts have held that a defendant is denied his Sixth Amendment right to counsel where his attorney sleeps through substantial portions of a trial. *See, e.g.*, *Burdine v. Johnson,* 262 F.3d 336, 349 (5th Cir. 2001) (en banc) (counsel repeatedly fell asleep for up to 10 minutes per incident while adverse witnesses were examined and evidence was introduced); *Tippins v. Walker,* 77 F.3d 682, 685 (2d Cir. 1996) (counsel was "unconscious for numerous extended periods of time during which the defendant's interests were at stake"); *Javor v. United States,* 724 F.2d 831, 833-34 (9th Cir. 1984) (counsel slept through substantial portions of the trial, missed some of the testimony, and, as witnessed by the trial judge, often had to be awakened by other attorneys). Prejudice is presumed in such cases,

1   pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), because sleeping counsel cannot

2   confer with the client, object to testimony, or perform adequate cross-examination.[19]

3   *Tippins*, 77 F.3d at 686.

4          In light of the presumption of prejudice applicable to Petitioner's allegation, the only

5   question is factual – did Mr. Dickey sleep through substantial portions of the trial?

6   Petitioner must show that the PCR court's ruling that Dickey did not sleep during trial was

7   an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2); *see Taylor v. Maddox*,

8   366 F.3d 992, 999-1000 (9th Cir. 2004) (habeas court may not second-guess a state court's

9   fact-finding process unless, after review of the state-court record, it determines that the state

10  court was not merely wrong, but actually unreasonable).  Petitioner has not met that burden.

11         The record does not support a finding that Dickey slept through substantial portions

12  of the trial.  Only Petitioner testified that he actually observed Dickey sleeping, and, other

13  than Petitioner, only Ms. O'Neill clearly observed signs that Dickey had nodded off.  Other

14  witnesses, equally well situated to make such observations, did not see Dickey with his eyes

15  closed or jerking his head as if awakened.  Dickey himself did not remember falling asleep

16  during the trial, conceding only that if he did, the incidents consisted of brief cat naps and

17  did not affect his performance.  Moreover, contrary to Petitioner's testimony, Dickey and

18  co-counsel Gavin stated that Petitioner did not complain to them about Dickey falling asleep

19  in court.  Furthermore, as demonstrated by the State (*see* RT 1/22/02 at 145-66) and found

20  by the PCR court, Dickey was active and zealously involved on Petitioner's behalf during

21  the periods when Petitioner claimed he was asleep – specifically, during the testimony of

22  Detective Lent, whom he cross-examined and to whose direct testimony he offered

23

24         [19] In *Cronic*, the Supreme Court held that prejudice must be presumed for purposes
25  of an ineffective assistance claim under the Sixth Amendment where counsel entirely fails
    to subject the prosecution's case to meaningful adversarial testing.  466 U.S. at 659.  Where
26  no such breakdown in the adversarial process occurred, an ineffective assistance of counsel
    claim is subject to the two-pronged standard established in *Strickland v. Washington*, 466
27  U.S. 668 (1984).

28

numerous objections, Dr. Schieve, whom he cross-examined, and defense expert Jack Nelson, whom he examined directly and on re-direct.  The trial transcript does not reflect, nor does Petitioner identify, any deficiency in Dickey's handling of these witnesses, and nothing in Dickey's performance suggests that he was less than fully aware of the witnesses' testimony.  *See* RT 6/1/92, Vol. I, at 29-84, Vol. II, at 4-90; RT 6/3/92, Vol. II, at 10-29, 35; RT 6/10/92, Vol. I, at 50-79, Vol. II, at 3-50.

Petitioner contends that he "did not receive a full and fair hearing because the key witness on the subject was the trial judge who did not testify but instead presided over the proceeding."  Dkt. 40 at 152.  The Court does not agree with this assessment.  The fact-finding process in state court was not defective in any of the ways identified by the Ninth Circuit in *Taylor*.  The PCR court held an evidentiary hearing at which Petitioner, Dickey, and other witnesses testified.  *Taylor*, 366 F.3d at 1000.  The Court did not "misapprehend or misstate the record" or "fail[] to consider key aspects of the record."  *Id.* at 1001, 1008.  Instead, as indicated in its ruling, the court considered and weighed all of the relevant evidence, while engaging in the "process of explaining and reconciling seemingly inconsistent parts of the record," *id.* at 1007, including the conflicting testimony of Petitioner and the other witnesses at the evidentiary hearing.  The evidentiary hearing thus allowed the court to make the required credibility determinations.  *See Earp v. Ornoski*, 431 F.3d 1158, 1169 (9th Cir. 2005) (emphasizing the need for evidentiary hearings where credibility determinations are necessary to resolve claims).

Petitioner complains that it was unfair for the same judge to preside over both the trial and the PCR proceedings.  Dkt. 40 at 152; *see* Dkt. 56 at 49-50.  This criticism is without merit.  In *Gerlaugh*, 129 F.3d at 1036, the Ninth Circuit held that the judge who presided over the defendant's capital murder trial could also preside over the post-conviction proceedings: "We cannot identify any fault with Arizona's rule that assigns post-conviction review matters to the original trial judge."  The court rejected "the false assumption that trial judges are not capable of doing what the law requires."  *Id.; see also Smith v. Stewart*, 140

1   F.3d 1263, 1271 (9th Cir. 1998) ("Had the judge who heard the post-conviction proceeding

2   also been the trial and sentencing judge, we would be considerably less inclined to order

3   relief[.]'") (quoting *Gerlaugh*, 129 F.3d at 1036).

4       Because the Court cannot conclude that the PCR court's denial of this claim was an

5   unreasonable determination of the facts, Claim 45 is denied.

6                            **CERTIFICATE OF APPEALABILITY**

7       In the event Petitioner appeals from this Court's judgment, and in the interests of

8   conserving scarce resources that might be consumed drafting and reviewing an application

9   for a certificate of appealability (COA) to this Court, the Court on its own initiative has

10  evaluated the claims within the petition for suitability for the issuance of a certificate of

11  appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

12      Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

13  is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

14  certificate of appealability ("COA") or state the reasons why such a certificate should not

15  issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

16  made a substantial showing of the denial of a constitutional right."  This showing can be

17  established by demonstrating that "reasonable jurists could debate whether (or, for that

18  matter, agree that) the petition should have been resolved in a different manner" or that the

19  issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*,

20  529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For

21  procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the

22  petition states a valid claim of the denial of a constitutional right and (2) whether the court's

23  procedural ruling was correct.  *Id.*

24      The Court finds that reasonable jurists, applying the deferential standard of review

25  set forth in the AEDPA, which requires this Court to evaluate state court decisions in the

26  light of clearly established federal law as determined by the United States Supreme Court,

27  could not debate the resolution of the merits of Petitioner's claims as set forth in this order.

28

Further, for the reasons stated in the Court's order regarding the procedural status of Petitioner's claims filed on September 30, 2005 (Dkt. 90), the Court declines to issue a COA with respect to any claims that were found to be procedurally barred or were otherwise denied.

**IT IS ORDERED:**

1.      Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 40) is **denied**.

2.      The Clerk of Court shall enter judgment accordingly.

3.      The stay of execution issued by this Court on April 28, 2003, is vacated.

4.      A Certificate of Appealability is denied.

5.      The Clerk of Court shall forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 30th day of May, 2008.

David G. Campbell
United States District Judge